**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**CHESTER HOLDINGS, LTD., et al., Defendants.**

**No. CIV. A. 97–1654 (MTB).**

United States District Court, D. New Jersey.

Feb. 19, 1999.

508

509

Susan C. Cassell, United States Attorney's Office, Newark, NJ, for S.E.C.

Joseph Pignatiello, Coral Springs, FL, pro se.

Constance Pignatiello, Coral Springs, FL, pro se.

Christopher Werner, Newport, RI, pro se.

### OPINION

BARRY, District Judge.

The Securities and Exchange Commission ("SEC" or "plaintiff") has brought this civil enforcement action against Chester Holdings, Ltd., formerly known as Aqua Buoy Corporation ("Aqua Buoy"); Joseph Pignatiello; Constance Pignatiello; and Christopher Werner ("Werner"). On August 20, 1997, a final order of permanent injunction was entered by consent against

Chester Holdings. In addition, on October 8, 1998, a final order of permanent injunction was entered by consent against Christopher Werner. The only defendants who remain in this case are, therefore, Joseph and Constance Pignatiello (collectively as "defendants") and the SEC now moves for summary judgment against each of them. For the following reasons, this court will grant the SEC's motion.

## I. STATEMENT OF FACTS

Aqua Buoy was formed in December 1988 and, on June 19, 1989, merged with Seek Ventures, Inc., a company then registered with the SEC. Exh. 13 [1] at 12. From 1989 to 1994, Aqua Buoy's securities were registered with the SEC pursuant to Section 12(g) of the Securities Exchange Act of 1934 and its common stock was traded over the counter on NASDAQ. Exh. 53 at 14–15.[2]

Joseph Pignatiello founded Aqua Buoy and was its first CEO, President and Chairman of the Board of Directors. Exh. 1 ¶ 6, Exh. 2 ¶ 6. He resigned as President in July 1990 and as CEO and Chairman in May 1991 but continued on as Director of International Marketing. Id.; Exh. 10 at 3; Exh. 6 at 82–83. Constance Pignatiello, Joseph's wife, was Aqua Buoy's Secretary and Treasurer from June 1989 to July 1990, President from July 1990 to February 1992, and a director from June 1989 to February 1992. Exh. 1 ¶ 7; Exh. 3 ¶ 7. Her parents were also directors of Aqua Buoy. Exh. 17 at 28. Werner was Aqua Buoy's Controller from January 1989 to April 1991, Exhs. 1, 2, 3 ¶ 8, its Secretary–Treasurer from July 1990 to February 1993, and its Chief Financial Officer and a director from April 1991 to February 1993. Exh. 17 at 28; Exh. 46 at 31.

This action revolves around the following five acquisitions by Aqua Buoy in 1991:(1) manufacturing equipment acquired from Aqua Buoy International, Inc. ("ABI"); (2) Leven Oaks, a hotel and restaurant retirement facility in California; (3) a commercial building in Michigan acquired from H & R Corporation ("H & R"); (4) certain assets of Lord Jeff Knitting Company, Ltd. ("Lord Jeff"), a bankrupt sweater manufacturer; and (5) equipment, trademarks and trade names acquired from Pearson Yachts Corporation ("Pearson"), a bankrupt boat manufacturer.

On March 15, 1991, Aqua Buoy acquired from ABI the manufacturing equipment, along with the necessary trademarks and patents, to produce the Aqua Buoy Flotation Aid ("ABI acquisition"). Exh. 17 at 7.

Mitchell, Londer & Company ("Mitchell Londer") was Aqua Buoy's independent auditor and supplied an Independent Auditor's Report dated July 19, 1990 to accompany Aqua Buoy's 1990 10–K statement for the fiscal year ending June 30, 1990 ("1990 10–K"). Exh. 13 at F–1, F–2. Monty Lamirato ("Lamirato"), an accountant at Mitchell Londer, was the audit manager for Aqua Buoy. Exh. 21 at 10. On February 28, 1991, Joseph Pignatiello wrote to Londer, described the upcoming ABI acquisition, and stated, inter alia, that:

> 1. We are purchasing the manufacturing facility for $1,353,000 which is $153,-000 in cash and 300,000 shares of restricted 144 stock at $4.00 per share.

Exh. 23 at 1. Lamirato testified that he informed Joseph Pignatiello that Aqua Buoy's $4.00 per share valuation of the 300,000 shares of unregistered common stock issued in connection with the ABI acquisition, did not comply with Generally Accepted Accounting Principles ("GAAP"). Exh. 21 at 49–51. Lamirato explained to Joseph Pignatiello that because the shares of Aqua Buoy's common stock were publicly trading at between $1.00 and $1.50 per

---

**1.** Unless otherwise indicated, all references to exhibits shall be to the four volumes of exhibits attached to the Declaration of Gerald A. Gross.

**2.** On September 27, 1993, Aqua Buoy changed its name to Chester Holdings. Gross. Decl., Exh. 53 at 2.

share at the time of the ABI acquisition,[3] and because Rule 144 stock is restricted stock that cannot be immediately sold, the 300,000 shares should be valued at approximately 25–50% less than $1.00–$1.50 per share. Exh. 21 at 46–51, 56–58. Lamirato also explained that Mitchell Londer "would not certify and opine upon the value that [Aqua Buoy] was placing on the transaction." Exh. 21 at 47. On April 15, 1991, Aqua Buoy terminated Mitchell Londer as its independent auditor. Exh. 21 at 51; Exh. 22 at 2.

Notwithstanding Lamirato's comments, Aqua Buoy issued a press release on March 3, 1991 ("March 3, 1991 Press Release"), prepared by Joseph Pignatiello and signed by Constance Pignatiello, Exh. 6 at 129, which stated that the ABI assets were acquired for $1,353,000 in cash and equity. Exh. 15. As was more specifically delineated in Aqua Buoy's 10–Q statement for the quarter ending March 31, 1991 filed with the SEC on April 29, 1991 ("March 1991 10–Q"), the $1,353,000 was in the form of a promissory note for $153,000 and 300,000 shares of Aqua Buoy unregistered stock valued at $4.00 a share. Exh. 19 at 10. Aqua Buoy also represented the value of the ABI acquisition as $1,353,000 in its 10–K statement for the fiscal year ending June 30, 1991 ("1991 10–K"). Exh. 17 at 7–8. Finally, the SEC asserts, and defendants do not deny, that the 1991 Annual Report to Shareholders ("1991 Annual Report") and a press release dated July 27, 1991 announcing the 1991 10–K ("July 27, 1991 Press Release") listed Aqua Buoy's total assets as $7,538,609 which included the valuation of the ABI acquisition at $1,353,000. Exh. 41; Exh. 40.

On May 8, 1991, Aqua Buoy purchased Leven Oaks, a retirement facility in California ("Leven Oaks acquisition"). Exh. 17 at 8. Aqua Buoy issued a press release on May 13, 1991 ("May 13, 1991 Press Release"), prepared by Joseph Pignatiello and reviewed by Constance Pignatiello, Exh. 11 at 19–20, which stated that Leven Oaks was purchased for $1,940,000. Exh. 26. As was specified in Aqua Buoy's 1991 10–K, the $1,940,000 represented $1.2 million and 146,000 shares of unregistered common stock valued at $5.00 per share. Exh. 17 at 8. The quoted market price of Aqua Buoy common stock on May 8, 1991 was $1.50 per share. Exh. 27. The SEC asserts, and defendants do not deny, that the 1991 Annual Report and the July 27, 1991 Press Release announcing the 1991 10–K listed Aqua Buoy's total assets as $7,538,609 which included the valuation of the Leven Oaks acquisition at $1,940,000. Exh. 41; Exh. 40.

Next, on June 10, 1991, Aqua Buoy acquired 100% of the shares of H & R whose sole asset was a commercial building located in Michigan ("H & R acquisition"). Exh. 17 at 9. Aqua Buoy issued a press release on July 21, 1991 ("July 12, 1991 Press Release"), prepared by Joseph Pignatiello and reviewed by Constance Pignatiello, Exh. 6 at 178, which stated that it had acquired the H & R building which had an "M.A.I. appraised value of $2.75 million, in exchange for shares of [Aqua Buoy's] unregistered shares of stock [and Aqua Buoy] will assume approximately $590,000 in debt as part of the agreement." Exh. 33. Aqua Buoy's 1991 10–K reported that the $2.75 million represented Aqua Buoy's assumption of $490,000 in a first mortgage plus the issuance of 433,000 shares of Aqua Buoy unregistered common stock valued at $5.00 a share. Exh. 17 at 8.

In July 1991, before Aqua Buoy filed its 1991 10–K statement, Lamirato reviewed a draft of the 10–K for the purpose of Mitchell Londer reissuing its opinion concerning Aqua Buoy's financial statements for the year ending June 30, 1990. Exh. 24, Exh. 21 at 83–87. On July 25, 1991, Lamirato sent a letter to Werner regarding Aqua

---

**3.** At the time of the ABI acquisition, the quoted market price of Aqua Buoy stock was $1.25 per share. Exh. 20.

Buoy's proposed 1991 10–K statement ("July 25, 1991 Letter"). Exh. 24. In that letter, Lamirato stated:

> 8. We assume you will be able to support a common stock value of $4–5 per share used in acquiring various businesses when the free trading price of the Company's common stock never exceeded $2.88.

Exh. 24 at 2, ¶ 8.[4] Neither Joseph nor Constance Pignatiello contest Werner's assertion that they saw the letter. Exh. 11 at 68.

Werner then faxed a letter to Lamirato which responded to Lamirato's concerns and stated with respect to paragraph eight:

> 8. According to counsel, the price for which we traded shares of stock is to our advantage and the price is substantiated by the acceptance of the buyer to trade his equity at that level. Each owner has signed a subscription agreement drawn up by counsel which states all of the risk factors and that each owner is aware that he could lose his entire investment.

Exh. 42 at 1, ¶ 8. Joseph Pignatiello drafted this paragraph of the letter. Exh. 11 at 75.

In response, Lamirato sent another letter to Werner on July 26, 1991 which further commented on paragraph eight by stating:

> *Comment # 8:* We assume you and your current accountants have reviewed the SEC guidelines for valuing stock.

Exh. 43 at 1. Werner distributed the letter to both Joseph and Constance Pignatiello. Exh. 11 at 80.

Notwithstanding the above correspondence, Aqua Buoy's 1991 10–K reported the H & R acquisition at $2,750,000 which included, in part, 433,000 shares of Aqua Buoy unregistered common stock valued at $5.00 a share. Exh. 17 at 8. In addition,

the SEC asserts, and defendants do not deny, that the 1991 Annual Report and the July 27, 1991 Press Release announcing the 1991 10–K listed Aqua Buoy's total assets as $7,538,609 which included the valuation of the H & R acquisition at $2,750,000. Exh. 41; Exh. 40.

On September 27, 1991, Aqua Buoy acquired Lord Jeff, a bankrupt sweater manufacturer. Exh. 60. On October 29, 1991, Aqua Buoy filed its 10–Q statement for the quarter ending September 30, 1991 ("September 1991 10–Q") which had been prepared by Joseph Pignatiello and Werner and signed by Constance Pignatiello. Exh. 11 at 162–63. The September 1991 10–Q highlighted increases in total assets and shareholder equity of $15,380,745 and $14,151,745, respectively, between June 30, 1991 and September 30, 1991. Exh. 59 at 3. The $14–15 million increase was attributed primarily to the Lord Jeff acquisition. Exh. 1 ¶ 27; Exh. 2 ¶ 27; Exh. 3 ¶ 27.

Aqua Buoy's $14–15 million valuation of Lord Jeff was principally based on a payment of $85,000 in cash to Lord Jeff's unsecured creditors and the issuance of four million shares of Aqua Buoy stock valued at $3.50 per share. Defs.' Br. at 11;[5] Exh. 61 at 2–3; Exh. 7 at 455. The four million shares were purportedly distributed in the following way: (1) 1.5 million shares to Lord Jeff creditors, including 125,000 shares held in escrow to compensate for any royalty shortfalls; (2) 1.5 million shares to Robert Hoy, President of Lord Jeff; (3) 500,000 shares to Landmark Financial Corp., an investment bank; and (4) 500,000 shares to Constance Pignatiello. Exh. 7 at 455–56; Exh. 12 at 20; Exh. 61 at 2–3.

Aqua Buoy also issued a press release on October 29, 1991 ("October 29, 1991 Press Release"), prepared by Joseph Pignatiello, Exh. 7 at 77–78, announcing the financial results for the quarter ending

---

4. On June 10, 1991, the quoted market bid price for Aqua Buoy's common stock was $2.875 per share. Exh. 36.

5. Defendants' brief entitled "Response to Plaintiff's Motion for Summary Judgment" will hereinafter be referred to as "Defs.' Br."

September 30, 1991. It compared Aqua Buoy's total assets in 1991 of $22,919,354 to $448,097 in 1990. The increase was due to the ABI, Leven Oaks, H & R and Lord Jeff acquisitions.

Finally, Aqua Buoy acquired Pearson for "cash and stock" and issued two press releases on October 21, 1991 ("Pearson Press Releases"), prepared by Joseph Pignatiello and reviewed by Constance Pignatiello, Exh. 7 at 247–48, announcing the acquisition. Exhs. 74, 75. In January 1992, Aqua Buoy filed an 8–K with the SEC which was prepared by Werner, reviewed by Joseph Pignatiello and signed by Constance Pignatiello ("Pearson 8–K"). Exh. 7 at 267–68; Exh. 77 at 2. The Pearson 8–K stated that Aqua Buoy had acquired Pearson for $1,250,000 in cash and stock ($250,000 cash and 173,077 shares of unregistered Rule 144 stock). Exh. 77 at 2.

On November 5, 1991, Ed O'Connell ("O'Connell"), a partner at the accounting firm of Wiss & Company ("Wiss"), wrote to Werner, with copies sent to Joseph Pignatiello, regarding the Lord Jeff acquisition. Exh. 60.[6] In his letter, O'Connell stated that the September 1991 10–Q "must be amended" in order to recompute the value of the Lord Jeff acquisition. Exh. 60 at 1. The Lord Jeff acquisition should have been recorded at 1,375,000 shares at $3.50 per share (totaling $4,812,000) to unsecured Lord Jeff creditors, royalties to unsecured creditors "collateralized" by 125,000 shares, $85,000 cash to unsecured creditors, $254,000 cash to administrative claims, and 17,000 shares to landlord at $3.50 per share (totaling $60,000). Exh. 60 at 1. Thus, he concluded, the Lord Jeff assets should have been valued at $5,649,000 instead of $14–15 million. Exh. 60 at 1. He stated, "I'm really lost as to where the balance of the four million shares are that [Joseph Pignatiello] said were paid for Lord Jeff." Exh. 60 at 2.

On November 13, 1991, O'Connell wrote to Joseph Pignatiello regarding the accounting for the Lord Jeff acquisition and stated that the September 1991 10–Q Statement should be "revised." Exh. 61 at 3. O'Connell explained:

the fair value for [the Lord Jeff Acquisition] (approximately $4,958,000 using the values in the Disclosure Statement, plus contingent consideration of up to $438,000) should be considered as part of the Company's investment in (or advance to) Lord Jeff.

Exh. 61 at 2. This "fair value" included $85,000 cash, 1,375,000 shares of common stock valued at $3.50 per share, 125,000 shares to compensate for royalty shortfalls, and 17,000 shares to the landlord to pay for back rent. Exh. 61 at 2. As for the remaining two and a half million shares that Aqua Buoy had reported as part of the transaction, O'Connell stated:

We understand that additional shares were issued by the Company of which 1,000,000 were, or are to be, issued to investment bankers for finder's fees and consulting services directly related to the acquisition. We understand there is no documentation as to the nature of these services. To the extent that financing or equity underwriting are involved, these costs should be classified as deferred financing costs or reductions to paid-in-capital.

In addition, we understand that 1,500,000 shares were, or are to be, issued to Mr. Hoy or Lord Jeff. The purpose of this issuance appears outside of the requirements for the Company to acquire Lord Jeff. Further, we understand that some of these shares are to be re-issued to employees of Lord Jeff. Since these shares do not represent payment for Lord Jeff's obligations, they apparently relate to future compensation.

Exh. 61 at 2.

On November 18, 1991, O'Connell again wrote to Joseph Pignatiello stating that

---

6. On October 4, 1991, Constance Pignatiello had signed an engagement letter with Wiss on behalf of Aqua Buoy. Exh. 66.

both the 1991 10–K and the September 1991 10–Q were "materially misstated." Exh. 68 at 1. He went on to remind Joseph Pignatiello that "I have previously advised you on our conclusions on accounting for the Lord Jeff acquisition. If the Company is willing to correct these filings, we should continue as agreed." Exh. 68 at 1.

On December 12, 1991, O'Connell wrote to Joseph Pignatiello regarding the 1991 10–K and certain documents relating to, *inter alia,* the ABI, Leven Oaks and H & R acquisitions. He opined that the shares of restricted unregistered Aqua Buoy common stock in each of acquisitions should have been valued at between approximately $0.63 and $1.10 per share. Exh. 25 at 3. This opinion was reached because between January 1, 1991 and March 31, 1991, the mid range of low and high bids for the shares was $1.25 per share and between April 1, 1991 and June 30, 1991, it was $2.19 per share. Therefore, after a 50% discount due to restrictions on marketability, a $0.63 value should have been used for third quarter acquisitions and a $1.10 value for fourth quarter acquisitions. *Id.*

More specifically, O'Connell opined that the ABI assets should have been valued at $342,000 instead of $1,353,000 as reported in the 1991 10–K. *Id.* at 3. This figure was based upon an estimated fair market value of $189,000 for Aqua Buoy's common stock valued at $0.63 per share. *Id.*

In addition, O'Connell stated that the Leven Oaks acquisition should have been valued at $1,380,000 instead of the $1,940,-000 reported in the 1991 10–K. *Id.* at 2. This valuation was based upon an estimated fair market value of $172,000 for Aqua Buoy's common stock valued at $1.10 per share. *Id.*

Finally, O'Connell informed Joseph Pignatiello that the H & R facility should have been valued at $1,061,300 as opposed to $2,750,000 as reported in the 1991 10–K. *Id.* This finding was based on an estimated fair market value of $476,300 for Aqua Buoy's common stock valued at $1.10 per share. *Id.*

O'Connell also recommended that an investment banker be engaged to precisely value the debt and equity securities as well as those issued in connection with the Lord Jeff acquisition. *Id.* at 3. He then concluded that, based on the above, the 1991 10–K and the September 1991 10–Q "should be amended." *Id.* at 4.

On December 13, 1991, O'Connell indicated in a letter to Werner that the September 1991 10–Q must be amended. Exh. 69 at 1. Copies of this letter were sent to Joseph and Constance Pignatiello. Exh. 7 at 204. Werner was advised by Joseph Pignatiello to disregard the letter. Exh. 7 at 205.

Werner testified that Joseph Pignatiello instructed him to inform O'Connell that Wiss's services were no longer needed regarding the September 1991 10–Q and the 1991 10–K statements but that O'Connell should continue the Lord Jeff audit. Exh. 7 at 206. Werner informed O'Connell of this by letter of December 16, 1991. Exh. 70.

Notwithstanding O'Connell's recommendations, Aqua Buoy filed its December 1991 10–Q with the SEC on February 18, 1992 without revising the asset valuations. Exh. 79. The December 1991 10–Q was prepared by Werner and reviewed by Joseph and Constance Pignatiello. Exh. 1 ¶ 30; Exh. 2 ¶ 30; Exh. 3 ¶ 30. The 10–Q reported $24,609,071 in total assets and $20,688,474 in shareholder equity. Exh. 79 at 3. The SEC contends, and defendants do not deny, that these amounts included the $1,353,000 valuation of the ABI acquisition, the $1,940,000 valuation of the Leven Oaks acquisition, the $2,750,000 valuation of the H & R acquisition, the $14,085,000 valuation of the Lord Jeff acquisition, and the $1,250,000 valuation of the Pearson acquisition. Exh. 7; SEC Statement of Facts Pursuant to Local Civ. R. 56.1 ¶ 220.

On May 12, 1992, Aqua Buoy filed its Form 10–Q signed by Werner for the

quarter ending March 31, 1992 ("March 1992 10–Q"). Exh. 14. The March 1992 10–Q reported the total assets for Aqua Buoy at $28,223,190 and the total shareholder's equity at $24,159,075. Exh. 14. The SEC contends, and defendants do not deny, that these amounts included the $1,353,000 valuation of the ABI acquisition, the $1,940,000 valuation of the Leven Oaks acquisition, the $2,750,000 valuation of the H & R acquisition, the $14,085,000 valuation of the Lord Jeff acquisition and the $1,250,000 valuation of the Pearson acquisition. Exh. 14; SEC Statement of Facts Pursuant to Local Civ. R. 56.1 ¶ 228.

On October 16, 1992, Aqua Buoy began to restate the valuation of its assets. The 10–K statement filed with the SEC for the fiscal year ending June 30, 1992 ("1992 10–K"), prepared and signed by Werner, Exh. 11 at 127–28, restated the value of Aqua Buoy's total assets from $28,223,651, as reported in its March 1992 10–Q, to $16,-227,444. Exh. 14 at 3; Exh. 46 at 14. Approximately $7,850,000 of the $11.9 million reduction in total assets was attributed to a reduction of $600,000 in the valuation of the Pearson acquisition, Exh. 46 at 25, and a reduction in the valuation of the Lord Jeff acquisition from approximately $14 million to $6.7 million. Exh. 46 at 25–26. The Lord Jeff acquisition was revalued based on the issuance of two million shares of unregistered common stock as opposed to four million. Exh. 46 at 26.

When Aqua Buoy's Form 10–KSB for the year ending June 30, 1993 was filed with the SEC ("1993 10–KSB"), the value of Aqua Buoy's total assets for 1992 was again restated from $16,227,444 in the 1992 10–K to $10,778,780 in the 1993 10–KSB. Exh. 46 at 14; Exh. 8 at F–3. Aqua Buoy attributed $3,779,125 of the reduction to "[a]djustment[s] for valuation of previously acquired companies for stock" during 1991 and 1992. Exh. 8 at F–26.

Between March 25, 1991 and December 17, 1992, in seventy-four transactions, Joseph and Constance Pignatiello sold 1,320,-107 shares of Aqua Buoy common stock

for $3,261,278.76. Exh. 81. These shares were sold through ten different trading accounts, in their own names, in the names of their children, in Aqua Buoy's name, and in the name of Jovijuco Investments, Inc., Constance Pignatiello's sub chapter S corporation. Exh. 81; Defs.' Br. at Exh. A. In October 1991 and March 1992, Aqua Buoy common stock had traded at over $6.00 per share. Exh. 38; Exh. 78. On November 12, 1993, Aqua Buoy common stock (then listed as Chester Holdings) closed at $0.875 a share. Exh. 80.

The SEC brings this action alleging that defendants made material misrepresentations by, *inter alia,* overstating the value of the five aforementioned acquisitions by a total of 120%, or $11.7 million, in its press releases, annual and quarterly reports. It also asserts that defendants engaged in insider trading and are liable as controlling persons. In response to deposition requests, both Constance and Joseph Pignatiello have asserted their Fifth Amendment privileges against self-incrimination with respect to all questions including, but not limited to: (1) the allegations of the complaint filed by the SEC on April 1, 1997; (2) the allegations contained in each of their answers to the complaint filed on June 17, 1997 including, but not limited to, all affirmative defenses asserted; (3) their transactions in the securities of Aqua Buoy; (4) transactions in the securities of Aqua Buoy by any other person or entity; and (5) any conversation, meeting or other communication, including telephone calls, concerning Aqua Buoy, or its business plans, financial condition, financial statements, press releases, and public filings. Exhs. 83, 84. Both appear *pro se.*

## II. *DISCUSSION*

### A. *Summary Judgment Motion*

Summary judgment is appropriate when, based on depositions, answers to interrogatories, admissions, and affidavits, it is clear that "there is no genuine issue as to any material fact and . . . the moving

party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When ruling on a motion for summary judgment, all facts and reasonable inferences drawn from the evidence are viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once that burden is met, responsibility then shifts to the nonmoving party to present specific evidence of a genuine issue for trial. *Id.* at 322–23, n. 3, 106 S.Ct. 2548. The nonmoving party may not rest upon mere allegations and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. If the nonmoving party fails to provide specific evidence against a properly supported motion for summary judgment, the "factual record will be taken as presented by the moving party and judgment will be entered as a matter of law." *Countryside Oil Co., Inc. v. Travelers Ins. Co.*, 928 F.Supp. 474, 480 (D.N.J.1995) (citation omitted).[7]

Defendants have submitted no evidence in response to the properly submitted, amply supported, motion for summary judgment filed by the SEC. It is well understood that "[i]n a motion for summary judgment, the nonmoving [party's] burden is more than insignificant." *Coover v. Saucon Valley School Dist.*, 955 F.Supp. 392, 398 (E.D.Pa.1997). When a motion for summary judgment has been made and supported, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Defendants are required to "go beyond the pleadings and by [their] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Stickney v. Muhlenberg College TIAA–CREF Retirement Plan*, 896 F.Supp. 412, 417 (E.D.Pa.1995) (quoting *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548); *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir.) (nonmovant must do more than create some metaphysical doubt), *cert. denied*, 510 U.S. 994, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993). Defendants' unsworn brief in opposition to the motion is not affirmative evidence much less evidence sufficient to defeat an amply supported motion for summary judgment by creating a genuine issue of material fact.[8] *See Anderson*, 477 U.S. at 256–57, 106 S.Ct. 2505.

Moreover, defendants cannot overcome their lack of evidence by claiming, as they

---

**7.** Upon the filing of a motion for summary judgment, "each side *shall* furnish a statement which sets forth material facts as to which there exists or does not exist a genuine issue." Local Civ. R. 56.1 (emphasis added). Defendants failed to comply with this rule and have submitted only a brief entitled "Response to Plaintiff's Motion for Summary Judgment." Because defendants are opposing plaintiff's motion *pro se,* this court will treat defendants' opposition brief as their statement of material facts, concomitantly assuming that all facts not addressed by defendants in their opposition brief are admitted. *Compare SEC v. Levy*, 706 F.Supp. 61, 63 n. 4 (D.D.C.1989) (treating *pro se* defendant's opposition brief as his statement of disputed facts but finding all facts not addressed by defendant in his brief to be admitted); *with SEC v. Falbo*, 14 F.Supp.2d 508, 520–21 (S.D.N.Y.1998) (finding that facts from movant's statement of undisputed facts were deemed admitted where non-movants—including one *pro se* party—failed to submit adequate statement of disputed facts as required by the local rules).

**8.** Although signed and notarized, neither defendant swore under oath or affirmed under penalty of perjury that the statements contained in the brief were true. *See* Gross Reply Decl., Exh. 1 ¶ 5.

do throughout their brief, that various documents that would support their assertions "are in the possession of the Plaintiff." *See, e.g.,* Defs.' Br. at 2, 3, 11, 13. Instead of supplying this court with affirmative evidence of a genuine issue of material fact, defendants attach a list of documents to their brief at Exhibit C and request plaintiff to produce these documents at trial. Even if Exhibit C was considered an application under Fed.R.Civ.P. 56(f), such a request would be denied. Rule 56(f) provides that a court may refuse to grant summary judgment if the nonmovant contends in an affidavit that he or she "cannot for reasons stated present by affidavit facts essential to justify the party's opposition." Fed.R.Civ.P. 56(f).

First, defendants have failed to file an affidavit stating why further discovery is necessary. As the Court of Appeals for the Third Circuit has stated:

> Rule 56(f) clearly requires that an affidavit be filed. The purpose of the affidavit is to ensure that the nonmoving party is invoking the protection of Rule 56(f) in good faith and to afford the trial court the showing necessary to assess the merit of a party's opposition.' An unsworn memorandum opposing a party's motion for summary judgment is not an affidavit.

*Pastore v. Bell Telephone Co. of Pa.,* 24 F.3d 508, 511 (3d Cir.1994) (citations omitted). The affidavit requirement aside, whether to grant a Rule 56(f) motion "depends, in part, on 'what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not been previously obtained.'" *San Filippo v. Bongiovanni,* 30 F.3d 424, 432 (3d Cir.1994) (citations omitted), *cert. denied,* 513 U.S. 1082, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995). Discovery was initially closed on March 30, 1998 but the deadline was extended to May 30, 1998 by Magistrate Judge Chesler's order of February 11, 1998. Although defendants were given over eight months in which to conduct discovery, they chose not to take a single deposition, request answers to any interrogatories, or ask for a single document. *See* SEC Reply Br. at 6. Moreover, they offer no explanation for only now claiming that documents they need or want are in plaintiff's possession and they have never indicated either to this court or to the magistrate judge that the SEC frustrated their efforts to obtain discovery. *See Dowling v. City of Philadelphia,* 855 F.2d 136, 140–41 (3d Cir.1988) (affirming district court's denial of Rule 56(f) request because, *inter alia,* party failed to pursue available discovery avenues and failed to comply with Rule 56(f)); *SEC v. Recile,* 10 F.3d 1093, 1098 (5th Cir.1993) ("[Rule 56(f) ] request need not be granted when the party opposing the motion 'simply rel[ies] on vague assertions that additional discovery will produce needed, but unspecified facts,' particularly when 'ample time and opportunities for discovery have already lapsed.'") (citations omitted). Defendants' offhanded and vague request for documents after discovery has closed—and without any explanation as to why such documents were not requested during discovery—will, therefore, not forestall summary judgment. *See Metsopulos v. Runyon,* 918 F.Supp. 851, 864 (D.N.J.1996) (nonmovant cannot defeat summary judgment by "attach[ing] to his brief a hodgepodge of statements, mostly unsworn" and requesting discovery after discovery had closed).[9]

---

9. The SEC asserts that defendants should be barred from offering any factual statements because they have asserted their Fifth Amendment privileges during discovery and refused to be deposed. In an appropriate civil case, aside from allowing an adverse inference, courts may preclude a party who had previously invoked the privilege from subsequently waiving it and introducing his or her own testimony. *See Gutierrez–Rodriguez v. Cartagena,* 882 F.2d 553, 557 (1st Cir.1989); *SEC v. Softpoint, Inc.,* 958 F.Supp. 846, 855–59 (S.D.N.Y.1997), *aff'd,* 159 F.3d 1348, 1998 WL 537522 (1998). The rationale for such preclusion is that

> invocation of the Fifth Amendment poses substantial problems for an adverse party who is deprived of a source of information

Notwithstanding all of the above, however, even if this court were to consider the factual statements in defendants' opposition brief as evidence in response to plaintiff's motion for summary judgment, defendants have not demonstrated the existence of a genuine issue of fact warranting a trial, as a summary of the law at issue here followed by the facts will make crystal clear.

■ The SEC asserts that defendants have violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a) ("Section 17(a)"), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) ("Section 10(b)"), Rule 10b–5, 17 C.F.R. § 240.10b–5, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) ("Section 20(a)"). The anti-fraud provisions of the federal securities laws prohibit fraud in the offer, sale or purchase of securities by the use of the mails or the instruments of interstate commerce. Section 17(a) provides as follows:

[i]t shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a). Section 17(a) "was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). This section "has been broadly construed to encompass a wide range of conduct." *See SEC v. Antar*, 15 F.Supp.2d 477, 528 (D.N.J.1998).

Section 10(b) and Rule 10b–5 have " 'always been acknowledged as catchalls' to prevent manipulation and misrepresentation" with respect to the purchase or sale of securities. *See Softpoint*, 958 F.Supp. at 862 (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 859 (2d Cir.1968) (*en banc*), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969)). Section 10(b) provides in relevant part:

[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

that might conceivably be determinative in a search for the truth. Moreover, because the privilege may be initially invoked and later waived at a time when an adverse party can no longer secure the benefits of discovery, the potential for exploitation is apparent.
*SEC v. Graystone Nash, Inc.*, 25 F.3d 187, 190 (3d Cir.1994). The Court of Appeals for the Third Circuit has set forth a balancing test to be used in determining whether preclusion of testimony is appropriate. The Court stated

that the trial court must balance the interests of the party claiming the protection of the Fifth Amendment and the adversary's "entitlement to equitable treatment." *Graystone Nash*, 25 F.3d at 192.

Because defendants are appearing *pro se,* and because the SEC will still prevail even if defendants' factual contentions are considered, this court will not attach preclusive effect to defendants' assertion of the Fifth Amendment.

15 U.S.C. § 78j(b). Section 10(b) is enforced through Rule 10b–5 which provides that

[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

■ In order to establish a violation of the anti-fraud provisions of the securities laws, the SEC must show: (1) misrepresentations or omissions of material fact; (2) in connection with the offer, sale or purchase of securities; and (3) that the defendants acted with scienter. *See SEC v. Hughes Capital Corp.*, 124 F.3d 449, 453 (3d Cir.1997); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir.1997); *Antar*, 15 F.Supp.2d at 528–29.

Defendants made material misstatements in numerous press releases and filings with the SEC in 1991 and 1992 primarily by overstating the financial condition of Aqua Buoy. The SEC has submitted the expert report of Sally L. Hoffman, CPA, CFE, ("Hoffman Report") which states that the accounting utilized to record the five acquisitions in question was not in accordance with GAAP and resulted in material overstatements of Aqua Buoy's assets and shareholders' equity. Exh. 12.

The ABI acquisition was valued at $1,353,000 which represents $153,000 in cash and 300,000 shares of restricted 144 stock at $4.00 per share. The Hoffman Report states that under Accounting Principles Board Opinion No. 16, Business Combinations ("APB 16"), the ABI acquisition should have been recorded at cost or the fair value of the consideration given. Exh. 12 at 12. At the time of the ABI acquisition, the quoted market price of Aqua Buoy stock was $1.25 [10] per share. Exh. 20. Thus, the ABI acquisition should have been recorded at a maximum of $528,000 which represents the $153,000 promissory note plus the 300,000 shares at the quoted market price of the shares or $1.25 per share. In addition, a further reduction may have been appropriate because the stock was restricted. Exh. 12 at 13. By recording the acquisition at $1,353,000 instead of $528,000, the ABI acquisition was overstated by approximately $825,000 or 156%.

Aqua Buoy again overstated its assets when it reported the value of the Leven Oaks acquisition as $1,940,000. According to the Hoffman Report, under GAAP, the stock issued in exchange for the Leven Oaks acquisition should have been valued at a maximum of the quoted market price of Aqua Buoy common stock on May 8, 1991, or $1.50 per share. Exh. 12 at 14–17; Exh. 27. Thus, the Leven Oak acquisition should have been valued at $1,427,608 which represents $1.2 million plus 146,000 Aqua Buoy shares valued at the quoted market price of the shares or $1.50 per share. By recording the acquisition at $1,940,000 instead of $1,427,608, the value

---

**10.** The SEC complaint, as does the expert report of Ms. Hoffman that relies upon the complaint, states that the market price of the Aqua Buoy stock at the time of the ABI acquisition was $1.375 per share. Exh. 1 ¶ 12; Exh. 12 at 12. However, in its brief, presumably after further research, the SEC states the market price of Aqua Buoy stock to have been $1.25 per share which comports with the bid price listed on the NNOTC Bulletin Board Weekly Opening Quotes Report for the week beginning March 11, 1991. Exh. 20; *see also* SEC Br. at 4–5.

of the Leven Oaks acquisition was overstated by approximately $512,392 or 36%.

The Hoffman Report also opines that the H & R acquisition was overstated in much the same way. Exh. 12 at 17–19. On June 10, 1991, the quoted market bid price for Aqua Buoy's common stock was $2.875 per share. Exh. 36. Therefore, according to the Hoffman Report, under GAAP, the H & R Assets should have been recorded at a maximum of about $1,830,000 which represents $588,000 of debt plus 433,000 shares at the quoted market price of the shares on the date of the acquisition, June 10, 1991, or $2.875 per share. Exh. 12 at 18. By recording the acquisition at $2,750,000 instead of at approximately $1,830,000, the value of the H & R acquisition was overstated by about 50%.

Aqua Buoy also overstated its financial condition with respect to the Lord Jeff acquisition but in a slightly different way. Aqua Buoy recorded the Lord Jeff acquisition at a cost of approximately $14 million consisting of four million shares valued at $3.50 per share and a small amount of cash. Exh. 12 at 19. Of the four million shares, (1) 1.375 million were issued to unsecured creditors under the Lord Jeff reorganization plan, along with 125,000 shares held in escrow to secure royalties, (2) 1.5 million shares were issued to Robert Hoy, President of Lord Jeff, (3) 500,-000 shares were issued to Landmark Financial Corp., an investment bank, and (4) 500,000 shares were issued to Constance Pignatiello. Exh. 12 at 20. The Hoffman Report opines that because only 1.375 mil-

lion shares were actually issued as consideration for the Lord Jeff acquisition, under GAAP, only 1.375 million shares should have been considered in the valuation of the Lord Jeff assets. Exh. 12 at 20–21. Thus, the Lord Jeff assets should have been valued at approximately $4,813,000 and were overstated by $9,188,000 or 191%. *Id.*

A further indication that the Lord Jeff acquisition was overstated was the fact that Aqua Buoy itself later restated its own value. In its 1992 10–K, Aqua Buoy restated the value of its total assets from $28,223,651, as reported in its March 1992 10–Q, to $16,227,444. Exh. 14 at 3; Exh. 46 at 14. Approximately $7,850,000 of the $11.9 million reduction in total assets was attributable to a reduced valuation of the Pearson acquisition by $600,000, Exh. 46 at 25, and a reduced valuation of the Lord Jeff acquisition from approximately $14 million to $6.7 million. Exh. 46 at 25–26.

The Pearson acquisition, as suggested above, was also overstated. The Pearson 8–K recorded the Pearson acquisition at $1,250,000, consisting of $125,000 in cash and 173,077 shares of unregistered common stock valued at $6.50 per share. Because at the time of the acquisition, the quoted market price for Aqua Buoy shares was $5.00 per share, the Hoffman Report opines that, under GAAP, the Pearson acquisition should have been recorded at a maximum of $990,000, i.e. $125,000 cash plus 173,077 shares valued at $5.00 per share. Exh. 12 at 25. Consequently, the Pearson assets were overstated by at least $260,000.[11]

---

**11.** The SEC asserts that a number of the SEC submissions and press releases were misleading, not only regarding overstated acquisitions, but with respect to other aspects of Aqua Buoy's business. For example, in its March 3, 1991 Press Release, Aqua Buoy stated that it "intends to move the [ABI] manufacturing facility to Colorado later this year and anticipates hiring approximately 50 new employees to manufacture and distribute the flotation aid." Exh. 15. The SEC asserts that this statement was misleading because Aqua Buoy did not disclose that the manufacturing

facility was not producing any Aqua Buoy flotation devices, Exh. 6 at 131, and that Aqua Buoy did not have the financial resources to move the equipment to the United States, *id.* at 125. Moreover, Aqua Buoy never manufactured Aqua Buoy flotation devices and the equipment was never moved to the United States. *Id.* at 111–13.

In addition, the May 13, 1991 Press Release stated that the Leven Oaks hotel was "operating profitably under present management ...." Exh. 26. The SEC contends that this was a false statement because the Leven Oaks

■ In response to the voluminous documentation and expert evidence supplied by the SEC with respect to Aqua Buoy's overstatements, defendants simply assert in their brief that the valuations set forth by the SEC are "false" and that defendants' valuations are those

> of an Independent appraiser that is world renowned for its work in this field. Copies of the appraisals are in the possession of the Plaintiff and, at a trial, the Independent Appraisal company would provide evidence proving the worth of the properties.

Defs.' Br. at 10. With respect to the Leven Oaks overstatement, defendants assert in their brief simply that "[a]t trial, evidence would be provided showing the value of The Leven Oaks acquisition." Defs.' Br. at 9. These bald conclusory statements are not enough to create a genuine issue of material fact. *See Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir.) (noting that nonmovant must set forth "specific facts" and "may not rest upon mere allegations, general denials, or . . . vague statements . . ."), *cert. denied*, 502 U.S. 940, 112 S.Ct. 376, 116 L.Ed.2d 327 (1991).

■ In one instance, however, defendants do attempt to provide some support for their assertion that they correctly valued the acquisitions. They assert in their brief that the ABI acquisition was not overstated as the value "was evaluated by Ernst & Whinney, one of the largest Independent Certified Public Accountants in the world." Defs.' Br. at 5. While defendants provide no documentation for this assertion, this court will assume that defendants are referring to a letter submitted by the SEC that purports to be from Ernst & Young. *See* Gross Reply Decl., Exh. 6.

The Ernst & Young letter does not create a genuine issue of material fact as to the value of the ABI acquisition because it does nothing more than confirm the existence of the assets. *See* Gross Reply Decl., Exh. 6 at 1. In fact, Werner specifically testified that Ernst & Young did not do a valuation of the ABI acquisition because it was too costly. He stated:

> [m]y first concern was do these assets exist. And here it states they did exist. Valuation. Nick Beamont informed me that Ernst & Young wanted about a five or $7500 fee to do valuation and he wasn't going to pay it. And Joe Pignatiello wasn't going to pay it on behalf of Aqua Buoy.

*Id.*, Exh. 4 at 155. Werner stated that Joseph Pignatiello "decided not to [spend the money and have the independent evaluation] done . . . [as he] more or less control[s] the company." *Id.* at 156. Finally, the Ernst & Young letter, if in fact it is from Ernst & Young as it is not on Ernst & Young letterhead, could not have been

---

hotel was operating at a loss of at least $22,-000 for the fiscal year preceding its acquisition. Exh. 29; Exh. 28 at F–4. In addition, the SEC asserts that the May 13, 1991 Press Release was misleading because it did not disclose that Aqua Buoy had failed to perfect its ownership interest in the Leven Oaks hotel in order to avoid triggering a "due on sale" clause contained in the mortgage. Exh. 26; Exh. 11 at 35–38.

Finally, the Pearson Press Releases stated that Eckart Wagner, formerly of Pearson Yachts, would "become acting Chairman of the new company" and would "implement the hiring of a corporate team of officers to operate the boat manufacturing subsidiary." Exh. 75 at 1. In addition, the press releases stated that Katherine Exner would "become acting Chief Financial Officer and Director of Marketing of the new company and assist in the selection of corporate management." Exh. 75 at 2. The SEC asserts that the Pearson Press Releases were misleading because neither Wagner nor Eckert worked for, or provided any services to, Aqua Buoy. Exh. 7 at 252–53, 396–98. Moreover, the SEC asserts that no employees were ever hired to work in the Pearson division of Aqua Buoy. Exh. 7 at 246–47.

This court need not reach the question of whether any or all of these statements were false, misleading, material, or whether defendants acted with scienter in making or issuing those statements because the elements of securities fraud are so clearly established based solely on the numerous overstatements part and parcel of the acquisitions.

the basis for the initial ABI valuations because it is dated September 3, 1991, well after the overstatement of the ABI acquisition contained in the March 3, 1991 Press Release, the March 1991 10–Q, the 1991 Annual Report, the July 27, 1991 Press Release and the 1991 10–K. *See* Gross Reply Decl., Exh. 6.

 Defendants do not argue that the overstatements of the financial condition of Aqua Buoy were not material and this court finds that they surely were material. In the context of the securities laws, a misstatement or omission is material if there is a "substantial likelihood" that a reasonable investor would consider the information important in making an investment decision. *See Basic v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (citing to *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1425; *In re Kidder Peabody Sec. Litig.,* 10 F.Supp.2d 398, 409 (S.D.N.Y.1998)). A reasonable investor would unquestionably find it important that Aqua Buoy's assets and shareholder equity, and hence its financial condition, were significantly overstated. *See Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 281 (3d Cir.) ("a reasonable investor would be influenced significantly by knowledge that a [company] has knowingly or recklessly hidden its true financial status ...*"), cert. denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992). Moreover, the overstatements were far from minor discrepancies as the acquisitions were overvalued by millions of dollars. Furthermore, the overstatements represented a high percentage of Aqua Buoy's total assets and shareholder equity. For example, in its 1991 10–K, Aqua Buoy's total assets and shareholder's equity were overstated by 43% and 85% respectively due to the overvaluations of the ABI, Leven Oaks and H & R acquisitions. When the Lord Jeff acquisition was added to the mix in the September 1991 10–Q, the overvaluations resulted in an overstatement of Aqua Buoy's total assets and shareholder's equity by 100% and 150% respectively. *Cf. Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 547 (8th Cir.1997) (finding alleged overstatements of assets by $6.8 million to be immaterial as a matter of law because, *inter alia,* the amount represented only 2% of Gateway's total assets); *but see In re Kidder Peabody,* 10 F.Supp.2d at 410 (holding that alleged false profits may still be material even if only affecting total profits by between 1% and 2.54%). Thus, no reasonable investor would consider the significant overstatements of Aqua Buoy's financial information to be unimportant in making an investment decision.

 Next, the overstatements were made in connection with the offer of securities. Section 10(b) and Rule 10b–5 liability can stem from "misstatements and omissions in press releases, news articles, and quarterly and annual public filings." *See In re Ames Dep't Stores, Inc. Stock Litig.,* 991 F.2d 953, 962 (2d Cir.1993). Defendants prepared, reviewed, and/or signed numerous public statements containing material overstatements of Aqua Buoy's acquisitions and financial condition while Aqua Buoy stock was being publicly traded. *See infra* at n. 13.

 Finally, the SEC has established that defendants acted with scienter in issuing the material misstatements. To prove scienter, the SEC must show that defendants lacked "a genuine belief that the information disclosed was accurate and complete in all material respects." *In re Phillips Petroleum Sec. Litig.,* 881 F.2d 1236, 1244 (3d Cir.1989) (quoting *McLean v. Alexander,* 599 F.2d 1190, 1198 (3d Cir. 1979)). Scienter includes both knowing and reckless misconduct. *See SEC v. United States Environmental, Inc.,* 155 F.3d 107, 111 (2d Cir.1998); *Antar,* 15 F.Supp.2d at 529 (citing *Phillips Petroleum,* 881 F.2d at 1244 ("[R]ecklessness on the part of a defendant meets the scienter requirement of Section 10(b) and Rule 10b–5")); *SEC v. Infinity Group Co.,* 993

F.Supp. 324, 329 (E.D.Pa.1998). Reckless- ness has been defined in this context as:

> highly unreasonable [conduct], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Sharp v. Coopers & Lybrand,* 649 F.2d 175, 193 (3d Cir.1981) (quoting *McLean v. Alexander,* 599 F.2d 1190, 1197 (3d Cir. 1979)), *cert. denied,* 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982).

Defendants, both experienced business people, unquestionably acted with the requisite scienter, be it recklessly or knowingly, when they overstated Aqua Buoy's assets and financial condition. La- mirato, Aqua Buoy's independent auditor, testified that he warned Joseph Pignatiello that valuing the restricted Aqua Buoy stock higher than the price at which it publicly traded would constitute a violation of GAAP. Exh. 21 at 49–51. He testified, moreover, that he told Joseph Pignatiello that, taking into consideration the market price of Aqua Buoy's stock as well as the restricted nature of the stock, the value of the ABI acquisition was not $1.3 million and Mitchell Londer "would not certify and opine upon the value that they were placing on the transaction." Exh. 21 at 47. Finally, while the 1991 10–K was being drafted, Lamirato wrote to Aqua Buoy and stated that the ABI, Leven Oaks, and H & R acquisitions were overstated. Exhs. 24; 43. More specifically, referring the com- pany to the SEC guidelines for valuing stock, Lamirato advised that Aqua Buoy would need some sort of support for the valuation of Aqua Buoy stock at $4–5 per share when the free trading price never exceeded $2.88. *Id.* Werner testified that both Joseph and Constance Pignatiello saw each of Lamirato's letters. Exh. 11 at 68, 80.

Defendants do not deny that they had conversations with, and saw the letters sent by, Lamirato. Instead, defendants inexplicably claim that they "were never warned of any overstatement" because if Mitchell Londer had any concerns about Aqua Buoy's financial statements, "they had an obligation as the previous auditors" to make a statement of possible material misleading statements. Defs.' Br. at 5–6. Because Mitchell Londer was the auditor for the 1990 financial statements, the argu- ment goes, it was required to "sign off" and approve the 1991 financial statements prepared by the new auditor. *Id.* · If Mitchell Londer had concerns about the 1991 financial statements, defendants con- clude, it was obligated to "make those statements in writing on the 10–K filings with the SEC." *Id.* Defendants are wrong.

The SEC has provided expert evi- dence that details the responsibilities of an auditor when he or she is requested by a former client to reissue an audit opinion. Gross Reply Decl., Exh. 7. Under General- ly Accepted Auditing Standards ("GAAS"), aside from ascertaining whether the suc- cessor's audit reveals any matters that "might have a material effect on, or re- quire disclosure in, the financial state- ments reported on by the predecessor au- ditor[,]" *Id.* ¶ 3 (referring to AU § 508.81), a predecessor auditor has no obligation to investigate events occurring after the orig- inal report date and before the report is reissued. *Id.* ¶ 5. In fact, when a prede- cessor auditor reissues his or her report on prior period financial statements, he or she "should use the date of his previous report to avoid any implication that he [or she] has examined any records, transactions, or events after that date." *Id.* ¶ 4 (referring to AU § 508.82). Here, Mitchell Londer issued an Independent Auditor's Report for Aqua Buoy's 1990 financial statements. Exh. 13 at F–1. When it reissued its report for the 1991 10–K, it was not obligated to revise the report to include the 1991 acqui- sitions as those acquisitions did not impact the 1990 report. Indeed, in reissuing its report for purposes of the 1991 10–K, Mitchell Londer used the same date as its

previous report to indicate that it was not opining as to events occurring after the original 1990 report was issued. Exh. 17 at 16.[12]

Defendants also dispute the SEC's characterization of the termination of Mitchell Londer. Defs.' Br. at 7. According to Lamirato, Mitchell Londer was terminated on April 15, 1991 after Lamirato explained to Joseph Pignatiello that the $1,353,000 valuation of the ABI acquisition did not comport with GAAP. Exh. 21 at 49–51. Lamirato believed Mitchell Londer was terminated because of its opinion on this matter. Id. at 51–52. Defendants disagree and assert that Mitchell Londer was terminated because its rates were too high. Defs.' Br. at 7. Any dispute as to why Mitchell Londer was terminated, however, does not create a genuine issue of material fact as to scienter for defendants were clearly warned that their valuations were overstated.

In addition to Lamirato's admonitions, defendants were also warned about overstatements by O'Connell, a partner at Wiss & Company. Between October 29, 1991 and December 13, 1991, O'Connell sent numerous letters stating that the 1991 10–K and the September 1991 10–Q must be amended. For example, in a letter written directly to Joseph Pignatiello, O'Connell advised that the ABI, Leven Oaks and H & R acquisitions were overstated because the stock was valued at a price greater than the public trading price. Exh. 25.

In another letter written to Joseph Pignatiello, O'Connell advised that the Lord Jeff acquisition was overstated because only 1.375 million shares were issued to Lord Jeff creditors. Exh. 61. Werner testified that Constance Pignatiello was given a copy of at least one of O'Connell's letters advising that the September 1991 10–Q and the 1991 10–K be corrected. Exh. 7 at 204.

Defendants do not deny that they saw O'Connell's letters. Defendants only state that O'Connell "did not make any 'warning'" because no money was ever paid to Wiss and Wiss was "unengaged" because it charged more than its estimate. Defs.' Br. at 14. This contention does not create a genuine issue of material fact because whether or not Aqua Buoy ever paid Wiss is irrelevant to whether O'Connell informed defendants that the Aqua Buoy valuations were significantly overstated.

Defendants' positions in Aqua Buoy illustrate that they were aware of the valuations being submitted to the SEC and the public. Constance was the President of Aqua Buoy until February 1992, during which time each acquisition was made. Joseph was the CEO and Chairman until May 1991 and was involved with the negotiations for each of the acquisitions. Exh. 2 ¶ 6. And, of course, each of the false or misleading documents was prepared, reviewed and/or signed by Joseph or Constance Pignatiello.[13]

---

12. Parenthetically, it is interesting to note that in October 1993, Aqua Buoy's successor auditor for its 1991 10–K, Bogner & Company, agreed to a restatement of the 1991 financial statements and the valuations of the ABI, Leven Oaks, and H & R acquisitions were reduced by $3,664,297. Exh. 8 at F–2, F–26. The SEC represents that it commenced administrative proceedings against Bogner & Company in October 1997 concerning its audits of Aqua Buoy. SEC Reply Br. at 12.

13. The March 3, 1991 Press Release which overstated the ABI acquisition was prepared by Joseph and reviewed by Constance. Exh. 6 at 128–29. The March 1991 10–Q which overstated the ABI acquisition was prepared in part by Joseph and signed by Constance.

Exh. 1 ¶ 14; Exh. 2 ¶ 14; Exh. 3 ¶ 14. The 1991 10–K which overstated the ABI, Leven Oaks and H & R acquisitions was prepared by Joseph and signed by Constance. Exh. 1 ¶ 20; Exh. 2 ¶ 20; Exh. 3 ¶ 20. The 1991 Annual Report which included the overstatements of the ABI, Leven Oaks and H & R acquisitions was signed by Constance. Id. The July 27, 1991 Press Release which included the overstatements of the ABI, Leven Oaks and H & R acquisitions was prepared by Joseph and reviewed by Constance. Exh. 1 ¶ 20; Exh. 2 ¶ 20; Exh. 3 ¶ 20; Exh. 11 at 59–60. The May 13, 1991 Press Release which overstated the Leven Oaks acquisition was prepared by Joseph and reviewed by Constance. Exh. 11 at 19–20. The July 12, 1991 Press Release which overstated the H & R

Another indication that defendants acted with scienter is the high level of trading in which defendants participated during the time the misstatements were being made. "Insider trading in suspicious amounts or at suspicious times is probative of bad faith and scienter." *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir.1989) (citing to *Goldman v. Belden*, 754 F.2d 1059, 1070 (2d Cir.1985)), *cert. denied*, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). Defendants sold over 1.3 million shares of Aqua Buoy common stock, or more than 80% of their shares, between March 25, 1991 and December 17, 1992, the time period during which the misstatements were made. Exh. 81; Exh. 17 at 30.

Finally, this court may draw an adverse inference with respect to scienter by virtue of defendants' invocation of their Fifth Amendment rights. Invocation of one's Fifth Amendment privilege in civil cases, either in depositions or at trial, permits an adverse inference to be drawn against the party invoking the privilege. *See Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[.]"); *Graystone Nash, Inc.*, 25 F.3d at 190.

Although scienter is generally a question for a jury, *see In re Kidder Peabody*, 10 F.Supp.2d at 409, based on the evidence presented to this court, no reasonable jury could find that defendants possessed a good faith basis for the overstated valuations. *See In re Apple Computer Sec. Litig.*, 886 F.2d at 1113 (noting that summary judgment may be granted as to scienter in appropriate securities fraud cases). Scienter is clearly established here.

Rule 10b–5 also imposes liability for insider trading. *Dirks v. SEC*, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). As the Supreme Court has stated:

> § 10(b) and Rule 10b–5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information. Trading on such information qualifies as a 'deceptive device' under § 10(b), we

acquisition was prepared by Joseph and reviewed by Constance. Exh. 6 at 178–79. The September 1991 10–Q which overstated the Lord Jeff, ABI, Leven Oaks, and H & R acquisitions was prepared by Joseph and signed by Constance. Exh. 11 at 162–63; Exh. 1 ¶ 26; Exh. 3 ¶ 26. The October 29, 1991 Press Release which overstated the Lord Jeff acquisition was prepared by Joseph. Exh. 7 at 76–78. The Pearson 8–K which overstated the Pearson acquisition was reviewed by Joseph and signed by Constance. Exh. 7 at 267–68; Exh. 77 at 2. The December 1991 10–Q which overstated the ABI, Leven Oaks, H & R, Lord Jeff and Pearson acquisitions was prepared in part by Joseph and reviewed by Constance. Exh. 1 ¶ 30; Exh. 3 ¶ 30; Exh. 7 at 274–75. The March 1992 10–Q which overstated the ABI, Leven Oaks, H & R, Lord Jeff and Pearson acquisitions was prepared in part by Joseph. Exh. 7 at 417–18.

At one point in their brief, defendants assert that the 1991 10–K was prepared by Werner and not the defendants. Defs.' Br. at 10. This contention must be rejected, however, because defendants have admitted that Joseph Pignatiello prepared the 1991 10–K along with Werner. Exhs. 1 ¶ 20; 2 ¶ 20. Constance Pignatiello also admitted that she signed it. Exh. 3 ¶ 20.

In addition, defendants contend that, contrary to Werner's testimony, the September 1991 10–Q was prepared solely by Werner and not by Joseph. Defs.' Br. at 11. Assuming this to be true, however, Constance does not deny that she signed the September 1991 10–Q. Defendants also contend that the March 1992 10–Q was prepared and signed by Werner and not the defendants. Defs.' Br. at 15. Defendants do not, however, deny that Joseph reviewed the document.

Finally, defendants assert that they were no longer associated with the company when the 1992 10–K and the 1993 10–KSB were filed with the SEC. Defs.' Br. at 15–16. This matters little because those statements are not the basis for this action and were primarily discussed by the SEC to illustrate that after the defendants were no longer involved with Aqua Buoy, the acquisitions were properly valued.

have affirmed, because 'a relationship of trust and confidence [exists] between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with the corporation.'

*United States v. O'Hagan,* 521 U.S. 642, ——, 117 S.Ct. 2199, 2207, 138 L.Ed.2d 724 (1997) (quoting *Chiarella v. United States,* 445 U.S. 222, 228, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980)). In sum, the securities laws prohibit insiders from selling that company's securities while in the possession of material non-public information. Defendants engaged in illegal insider trading when they sold 1,320,107 shares of Aqua Buoy common stock between March 1991 and December 1992. Exh. 81. During that time they knew that the total assets and shareholder equity of Aqua Buoy had been materially overstated in numerous press releases and SEC filings.

Defendants respond only ·by saying that they were forced to sell their stock because Aqua Buoy had failed to repay Constance Pignatiello for a loan of over a million dollars. Defs.' Br. at 16–17. Even assuming this statement were true, it does not negate any element of an insider trading violation. Defendants, as corporate insiders, knowingly sold stock while in possession of material non-public information, namely that Aqua Buoy's financial statements were significantly overstated. The fact that they were motivated to do so in order to recoup the money that Constance Pignatiello had loaned to Aqua Buoy is irrelevant. *See SEC v. United States Environmental, Inc.,* 155 F.3d 107, 112 (2d Cir.1998) (noting that defendant's "personal motivation for manipulating the market is irrelevant in determining whether he violated § 10(b)" so long as defendant ef-

fected the manipulative trades with scienter).

■■■■ Finally, the SEC has established that defendants are liable as controlling persons under Section 20(a) of the Exchange Act. *See* 15 U.S.C. § 78t(a).[14] To be liable under Section 20(a), the SEC must show that defendants were controlling persons over an entity that violated the securities laws. In addition, because a statutory good faith defense exists, to be liable, defendants must have culpably participated in the violation. *See Rochez Brothers, Inc. v. Rhoades,* 527 F.2d 880, 889–891 (3d Cir.1975), *cert. denied,* 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976); *In re Midlantic Corp. Shareholder Litig.,* 758 F.Supp. 226, 236 (D.N.J.1990).

■■■ Again, Aqua Buoy violated the reporting provisions of the securities laws by filing materially false or misleading reports. Section 13(a) of the Exchange Act and Rules 13a–1, 13a–11 and 13a–13 require issuers of securities registered pursuant to Section 12 of the Exchange Act to file Forms 10–K, 8–K and 10–Q. *See* 15 U.S.C. § 78m(a); 17 C.F.R. §§ 240.13a–1, 240.13a–11, 240.13a–13. The statements must not be misleading and financial reports are presumed to be misleading if not filed in accordance with GAAP. *See* 17 C.F.R. § 240.12b–20, 17 C.F.R. § 210.4–01(a)(4). As has been discussed previously, Aqua Buoy's March 1991 10–Q, 1991 10–K, September 1991 10–Q, Pearson 8–K, December 1991 10–Q and March 1992 10–Q were materially misleading and thus violative of Section 12 and 13(a) of the Exchange Act and Rules 13a–1, 13a–11, 13a–13 and 12b–20.

■■■ In addition, defendants were controlling persons vis-a-vis Aqua Buoy. A controlling person has been defined as one

---

14. Section 20(a) provides that:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to

whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation of cause of action.

15 U.S.C. § 78t(a).

who possesses, either directly or indirectly, "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Rochez Brothers,* 527 F.2d at 890 (quoting 17 C.F.R. § 240.12b–2(f)). When determining whether one is a controlling person, "heavy consideration [is given] to the power or potential power to influence and control the activities of a person, as opposed to the actual exercise thereof." *Id.* at 890–891. Defendants not only had the potential power to exercise control over Aqua Buoy given that they were officers and directors of the corporation when Aqua Buoy issued many of the misleading statements,[15] they were actively involved in the activities of Aqua Buoy when these statements were made. They participated extensively in the day-to-day operations of Aqua Buoy and used their home in Colorado as its offices until July or August of 1992. Exh. 7 at 423–24. No good faith defense, of course, applies because defendants knowingly participated in Aqua Buoy's violations by preparing, reviewing or signing the misleading financial statements. *See supra* at n. 13.

The SEC has more than met its burden for summary judgment under Fed.R.Civ.P. 56 by showing that defendants violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b–5, and Section 20(a) of the Exchange Act. Defendants have failed to come forward with evidence or even credible arguments to rebut the SEC's powerful showing. Plaintiff's motion for summary judgment is, therefore, granted.

## B. *Remedies*

### 1. *Permanent Injunction from Violating Securities Laws*

The SEC seeks an order permanently enjoining defendants from violating the securities laws in the future. Both the Securities Act and the Exchange Act provide for injunctive relief when any of their provisions has been violated. *See* 15 U.S.C. §§ 77t(b), 78u(d).

To obtain an injunction, the SEC must show that "there is a reasonable possibility that the defendant[s], if not enjoined, will again engage in the illegal conduct." *SEC v. Bonastia,* 614 F.2d 908, 912 (3d Cir.1980). The court must consider the following factors in determining whether there is a reasonable likelihood of future violations: (1) the degree of defendants' scienter; (2) whether the infraction was of an isolated or recurrent nature; (3) defendants' recognition of their wrongful conduct; (4) the sincerity of assurances against future violations; and (5) the likelihood, due to defendants' professional occupation, that future violations may occur. *Id.* at 912.

After considering the above factors, this court concludes that there is more than a reasonable likelihood of future securities violations by defendants and a permanent injunction is appropriate. First, defendants acted with a high degree of scienter as they were continually warned by more than one accountant that they were issuing materially overstated financial statements. Second, despite these warnings defendants repeatedly violated the securities laws by issuing the 1991 10–K, four 10–Q statements, numerous press releases and a Form 8–K which materially overstated Aqua Buoy's assets.

In addition, Joseph Pignatiello's past involvement with securities laws violations makes it extremely likely that future violations may occur. *See SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 807 (2d Cir.1975) (recognizing that "the commis-

---

**15.** It bears repeating that Joseph Pignatiello was the CEO and Chairman of the Board of Directors of Aqua Buoy until May 1991. Exhs. 1 ¶ 6–7; 2 ¶ 6. From May 1991 to July 1992, Joseph Pignatiello was Aqua Buoy's Director of International Marketing. Exh. 10 at 3; Exh. 6 at 82–83. In addition, Constance Pignatiello was Aqua Buoy's President from July 1990 to February 1992. Exhs. 1 ¶ 6–7; 3 ¶ 6.

sion of past illegal conduct is highly suggestive of the likelihood of future violations"). As was disclosed in Aqua Buoy's 1990 10–K statement:

On or about February 23, 1987, Mr. Pignatiello was restrained and enjoined, without admitting or denying the allegations, by the United States District Court for the District of Colorado from violating various provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934, including the Antifraud Provisions of those Acts. Prior thereto, Mr. Pignatiello was censured, fined and permanently barred from association with any other member firm by the National Association of Securities Dealers, Inc. Further, in 1986, Mr. Pignatiello pleaded guilty to one count of failing to file an income tax return for 1981 and to one count of conspiracy to defraud the United States by·impairing, obstructing and defeating the lawful functions of the I.R.S., by manipulative and deceptive devices in connection with the sale or purchase of securities and by false and fraudulent statements to cover up material facts to the Securities and Exchange Commission. For these, he was sentenced to two (2) years and fined a total of $35,000. Mr. Pignatiello was incarcerated from September 1986 to September 1987.

Exh. 13 at 18. Joseph Pignatiello is also presently under indictment in the Southern District of New York for conspiracy to commit securities fraud, wire fraud, and commercial bribery based on the manipulation by he and his codefendants of the public market for securities issued by Spaceplex Amusement Centers International, Inc. Gross Reply Decl., Exh. 3; Defs. Br. at 4.

With reference to the third and fourth factors, defendants have not recognized the wrongfulness of their actions and have not given any assurances against future violations. In addition, according to his letterhead, Joseph Pignatiello is doing business as a "Mergers & Acquisitions Business Consultant." Exh. 50. The above factors clearly show that there is a likelihood of future violations necessitating a permanent injunction against future violations of federal securities laws.

### 2. *Disgorgement*

■ The SEC also seeks disgorgement of all profits derived from defendants' violations of the securities laws. Disgorgement is proper under Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. It is an equitable remedy and its purpose is to "deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable." *SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1191 (9th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 902, 142 L.Ed.2d 901 (1999).

■ The SEC has the initial burden of establishing that the disgorgement figure "reasonably approximates the amount of unjust enrichment." *SEC v. First City Financial Corp.*, 890 F.2d 1215, 1231 (D.C.Cir.1989). The SEC need not "trace every dollar of proceeds misappropriated by the defendants" but must present a reasonable approximation of the illicit profits. *See Hughes Capital Corp.*, 917 F.Supp. at 1085 (citation omitted). On presentation of such a reasonable approximation, the burden shifts to defendants who must "demonstrate that the disgorgement figure is not a reasonable approximation." *First City*, 890 F.2d at 1232. All doubts concerning the approximation are to be resolved against defendants. *See SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996); *Hughes Capital Corp.*, 917 F.Supp. at 1085.

■ The amount to be disgorged may be measured by the difference between the price at which the transactions were effected and the market price of the stock at a "reasonable time after public dissemination of the inside information." *SEC v. MacDonald*, 699 F.2d 47, 54 (1st Cir.1983).

Here, defendants sold 1,320,107 shares of Aqua Buoy stock for $3,261,278.76 while in possession of material non-public information regarding the overvaluation of the company's financial statements. Had defendants sold their shares after the true financial condition of Aqua Buoy was finally disclosed in the 1993 Form 10–KSB, they would have received a maximum of $1,155,093.62 because the stock price closed at $0.875 per share on November 12, 1993, the day after the 1993 Form 10–KSB was filed. Thus, the SEC asserts that defendants were unjustly enriched in the amount of $2,106,185.14, i.e. $3,261,278.76 less $1,155,093.62.

In response, defendants state, but only in their brief, that they sold "much less" than $3,261,278.76 worth of stock. Defs.' Br. at 16. This unsubstantiated statement does not raise a genuine issue of material fact as defendants had previously *stipulated* to the authenticity of the trading records that illustrate the total proceeds that defendants received from their trades of Aqua Buoy stock. Exh. 81. In addition, defendants have not explained how the tax returns attached to their brief show that they sold "much less" than the figure submitted by the SEC and have not even submitted the tax returns of their children in whose name some stock was admittedly sold. Exhs. 1 ¶ 40; 3 ¶ 40.

Thus, this court finds that $2,106,185.14 is a reasonable approximation of defendants' unjust enrichment and this court will order disgorgement in this amount.

### 3. *Prejudgment Interest*

■■■ In addition, this court will order prejudgment interest in the amount of $1,398,641.98. This court has the discretion to award—or not award—prejudgment interest on damages awarded pursuant to the federal securities laws. *Hughes Capital Corp.*, 917 F.Supp. at 1089. In the context of section 10(b) and Rule 10b–5 actions, proof of the defendants' scienter is sufficient to justify an award of prejudgment interest. *See SEC v. Musella*, 748

F.Supp. 1028, 1043 (S.D.N.Y.1989), *aff'd*, 898 F.2d 138 (2d Cir.), *cert. denied*, 498 U.S. 816, 111 S.Ct. 57, 112 L.Ed.2d 32 (1990); *Rolf v. Blyth, Eastman Dillon & Co.*, 637 F.2d 77, 86–87 (2d Cir.1980). In enforcement actions, courts have calculated prejudgment interest using the interest rates established quarterly by the Internal Revenue Service for money owed to the United States Treasury. *See Hughes Capital Corp.*, 917 F.Supp. at 1090; *SEC v. Drexel Burnham Lambert Inc.*, 837 F.Supp. 587, 612 n. 8 (S.D.N.Y.1993), *aff'd*, 16 F.3d 520 (2d Cir.1994), *cert. denied*, 513 U.S. 1077, 115 S.Ct. 724, 130 L.Ed.2d 629 (1995). Using these rates, the SEC has calculated the prejudgment interest to be $1,398,641.98. Defendants have not contested the calculation and this court will award the full $1,398,641.98.

### 4. *Civil Penalties*

■■■ The SEC next requests a variety of civil penalties totaling $2,873,339.50 to be assessed against defendants. Those requests will be denied for two reasons. First, the disgorgement and prejudgment interest awarded is sufficient to divest defendants of their illegal gains as well as to deter future violations. Second, this court is troubled by the large penalties sought by the SEC against these defendants in comparison to those sought against Werner, a defendant in this case who previously signed a consent order. Werner was also involved in the administration of Aqua Buoy, negotiated many of the acquisitions, and helped to prepare many of the misleading financial statements. Further, he was aware of the correspondence from various accountants stating that the valuations were overstated. As provided in the consent order, however, the SEC did not seek civil penalties against Werner and suspended payment of disgorgement and prejudgment interest based apparently upon Werner's financial condition. This court will not, therefore, impose additional civil penalties upon defendants.

### 5. Permanent Injunction from Serving as Officers/Directors

Finally, the SEC requests that this court order that defendants be permanently barred from serving as officers or directors of a public company. The Securities Enforcement Remedies and Penny Stock Reform Act of 1990 ("Remedies Act") provides that, in an enforcement action, a federal court may enjoin defendants who have violated the anti-fraud provisions of the securities laws from serving as officers or directors of public companies. The Remedies Act provides that

> the court may prohibit, conditionally or unconditionally, and permanently or for such period of time as it shall determine, any person who violated [the applicable provisions] from acting as an officer or director [of a public company] if the person's conduct demonstrates substantial unfitness to serve as an officer or director . . . .

15 U.S.C. §§ 77t(e), 78u(d)(2). Substantial unfitness has been evaluated in the context of six factors: (1) the egregiousness of the underlying securities laws violations; (2) previous violations of the securities laws, if any, as well as any other breaches of fiduciary duty as a corporate officer or director; (3) defendants' roles or positions when they engaged in the fraud; (4) degree of defendants' scienter; (5) defendants' personal gain from the underlying violation; and (6) likelihood of future misconduct. *See SEC v. Patel*, 61 F.3d 137, 141 (2d Cir.1995) (citing to Jayne W. Barnard, *When is a Corporate Executive "Substantially Unfit to Serve"?*, 70 N.C.L.Rev. 1489, 1492–93 (1992)).

■ Based upon these factors, Joseph Pignatiello will be permanently enjoined from acting as an officer or director of a public company. As a corporate insider, Joseph Pignatiello knowingly and continually violated the securities laws by issuing material misstatements regarding the valuation of Aqua Buoy's assets despite numerous warnings that such valuations were not in accordance with GAAP. In addition, he profited from the fraud by engaging in insider trading while Aqua Buoy's financial condition was inflated by the overstatements. Finally, and most importantly, this is not Joseph Pignatiello's first securities violation. He has been restrained, censured, fined, and even imprisoned for prior securities violations and is currently facing criminal charges. *See supra* at 527. In light of this, as well as the fact that he has failed to assure this court that he will not engage in future violations and the fact that he is presently involved as a "Mergers & Acquisitions Business Consultant," Exh. 50, the likelihood of future misconduct is high and a permanent injunction preventing him from acting as an officer or director of a public company is appropriate.

■ This court will not, however, permanently bar Constance Pignatiello from holding a position as an officer or director of a public company but will bar her from holding such a position for a period of five years. While her behavior and culpability with respect to this violation are similar to that of her husband, she is not a repeat offender. That being the case, the likelihood of future violations is not as clear and this court will therefore not impose the severe penalty of a permanent bar. *See id.* (reversing district court's imposition of a permanent injunction against defendant because, absent past violations, an articulated factual basis for finding likelihood of recurrence was "essential"); *SEC v. Posner*, 16 F.3d 520, 521–22 (2d Cir.1994) (affirming district court's permanent injunction because, *inter alia*, defendants had committed past securities laws violations), *cert. denied*, 513 U.S. 1077, 115 S.Ct. 724, 130 L.Ed.2d 629 (1995).

### III. CONCLUSION

Based upon the foregoing, plaintiff's motion for summary judgment is granted. Defendants will be permanently enjoined from committing future violations of the securities laws. In addition, disgorgement

531

and prejudgment interest will be ordered. Civil penalties will not be assessed against either defendant. Defendant Joseph Pignatiello will be permanently enjoined from holding a position as an officer or director of a public company and defendant Constance Pignatiello will be enjoined from holding such a position for a period of five years.