**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Sam M. ANTAR, Allen Antar, and Benjamin Kuszer, Defendants,**

and

**Rori Antar, Sam A. Antar, Michelle Antar, Adam Kuszer, Sam Kuszer, Simon Kuszer, Rose Antar, and Sam M. Antar, Relief Defendants.**

**Securities And Exchange Commission, Plaintiff,**

v.

**Rose Antar, Ellen Antar Kuszer, Jill Antar, R.A.S., Partnership, L.P., and S.T., Partnership, L.P., Relief Defendants.**

Civil Action No. 93–3988.

United States District Court, D. New Jersey.

April 27, 2000.

Bruce I. Goldstein, Saiber, Schlesinger Satz & Goldstein, Newark, NJ.

Robert Goodman, Gersten, Savage, Kaplowitz, Fredericks & Curtin, LLP, New York City.

Craig DeMast, Tenzer, Greenblatt & Zunz, P.A., Hackensack, NJ.

Joseph L. Cook, Ravin, Sarasohn, Cook, Baumgarten, Fisch & Rosen, Roseland, NJ.

## OPINION

ACKERMAN, District Judge.

In an opinion issued on July 15, 1998, this court found that the defendants Sam M. Antar, Allen Antar, and Benjamin Kuszer engaged in an extensive, multifaceted fraud which consisted of cash skimming, falsification of inventory counts, and the inflation of sales figures of certain key stores for the purpose of artificially inflating the price of Crazy Eddie stock. *See SEC v. Antar,* 15 F.Supp.2d 477 (D.N.J. 1998) (the "Liability Opinion"). This court further found that the defendants, having artificially and fraudulently inflated the price of the stock, then sold their substantial stockholdings to an unwitting public for an enormous profit. Based upon these findings, this court held that the defendants were liable for insider trading, in violation of Section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5.

Presently to be determined by this court is the amount, if any, that the defendants, as well as the relief defendants,[1] must disgorge pursuant to the Liability Opinion. *See Antar,* 15 F.Supp.2d at 533 ("In sum, this court will order full disgorgement of profits from Sam M., Allen, Kuszer, and the Relief Defendants."). On December 1 and 4, 1998, this court held a bench trial on the issue of disgorgement. What follows are this court's findings and conclusions concerning the amount, if any, that the defendants and relief defendants must disgorge.

---

1. The relief defendants are Rori Antar, Sam A. Antar, Michelle Antar, Adam Kuszer, Sam Kuszer, and Simon Kuszer. All are the grandchildren of Sam M. Since the court's issuance of the Liability Opinion in this matter, relief defendants Adam Kuszer, Sam Kuszer and Simon Kuszer have settled their claims with the SEC. This court entered a consent judgment as to those relief defendants on March 20, 2000.

## I. *DISCUSSION*

### A. *Disgorgement*

Courts have the authority, pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, to order disgorgement of insider trading profits in an enforcement action brought by the Securities and Exchange Commission ("SEC"). *See SEC v. Hughes Capital Corp.,* 124 F.3d 449, 455 (3d Cir.1997); *SEC v. Patel,* 61 F.3d 137, 139 (2d Cir. 1995); *SEC v. First City Fin. Corp.,* 890 F.2d 1215, 1230 (D.C.Cir.1989). Disgorgement is an equitable remedy by nature, and the district court is therefore invested with broad discretion in fashioning an appropriate disgorgement order. *SEC v. Hughes Capital Corp.,* 917 F.Supp. 1080, 1085 (D.N.J.1996), *aff'd,* 124 F.3d 449 (3d Cir.1997). As noted by the district court in *Hughes Capital,* " '[d]isgorgement wrests ill-gotten gains from the hands of a wrongdoer ... [and thus] [i]t is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs.' " *Id.* (quoting *SEC v. Huffman,* 996 F.2d 800, 802 (5th Cir.1993)); *see also SEC v. First Pacific Bancorp,* 142 F.3d 1186, 1191 (9th Cir.1998) ("Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable."), *cert. denied,* 525 U.S. 1121, 119 S.Ct. 902, 142 L.Ed.2d 901 (1999); *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1474 (2d Cir.1996) ("The primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws."), *cert. denied,* 522 U.S. 812, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997).

■ It is well-established that " 'disgorgement need only be a reasonable approximation of profits causally connected to the violation.' " *Patel,* 61 F.3d at 139 (quoting *First City Fin.,* 890 F.2d at 1231). That the SEC is not required to prove the precise amount of disgorgement is grounded in the altogether reasonable observation that that endeavor would be impractical, if not impossible. *See Hughes Capital,* 917 F.Supp. at 1085 (noting that " 'plaintiff is not required to trace every dollar of proceeds misappropriated by the defendants ... nor is plaintiff required to identify monies which have been commingled by them' ") (quoting *SEC v. Great Lakes Equities Co.,* 775 F.Supp. 211, 214 n. 21 (E.D.Mich.1991), *aff'd,* 12 F.3d 214, 1993 WL 465161 (6th Cir.1993)). As one court has recognized:

> If exact information were obtainable at negligible cost, we would not hesitate to impose upon the government a strict burden to produce that data to measure the precise amount of the ill-gotten gains. Unfortunately, we encounter imprecision and imperfect information. Despite sophisticated econometric modeling, predicting stock market responses to alternative variables is, as the district court found, at best speculative. Rules for calculating disgorgement must recognize that separating legal from illegal profits exactly may at times be a near-impossible task.

*First City Fin.,* 890 F.2d at 1231. The plaintiff has the burden to establish that the disgorgement figure is a reasonable approximation of unlawful profits. *See Hughes Capital,* 917 F.Supp. at 1085. If the plaintiff satisfies this burden, the burden of proof shifts to the defendants to " 'demonstrate that the disgorgement figure is not a reasonable approximation.' " *Id.* (quoting *First City Fin.,* 890 F.2d at 1232).

■ It must be remembered that disgorgement may not be ordered as a punitive measure. *See Hughes Capital,* 917 F.Supp. at 1085. Due to the imprecise nature inherent in calculating the proper amount of disgorgement, however, the line between disgorgement and penalty is often blurred. Under these circumstances, the risk of uncertainty must generally fall on the defendants, whose illegal conduct cre-

ated the uncertainty in the first instance. *See First City Fin.*, 890 F.2d at 1232; *Hughes Capital*, 917 F.Supp. at 1085; *SEC v. Drexel Burnham Lambert Inc.*, 837 F.Supp. 587, 612 (S.D.N.Y.1993), *aff'd*, 16 F.3d 520 (2d Cir.1994). Put another way, one who has violated the insider trading laws should in no way gain any advantage from the inherent difficulty in calculating the amount of disgorgement. *See SEC v. Softpoint, Inc.*, 958 F.Supp. 846, 867 (S.D.N.Y.1997) ("Where an exact computation is not possible, the wrongdoer bears any risk of uncertainty."), *aff'd*, 159 F.3d 1348, 1998 WL 537522 (2d Cir.1998).

■ As found by this court in the Liability Opinion, the defendants sold Crazy Eddie stock with knowledge of the systematic frauds perpetrated at the company. Based upon the findings of this court, the defendants must be ordered to disgorge any profits made and any losses avoided from their trading of Crazy Eddie stock while in possession of material, nonpublic information concerning the multitude of frauds perpetrated at the company. Under the circumstances of this case, the "amount to be disgorged may be measured by the difference between the price at which the transactions were effected and the market price of the stock at a 'reasonable time after public dissemination of the inside information.'" *SEC v. Chester Holdings, Ltd.*, 41 F.Supp.2d 505, 528 (D.N.J.1999) (quoting *SEC v. MacDonald*, 699 F.2d 47, 54 (1st Cir.1983) (en banc)).

■ During the relevant time period, the defendants made the following sales of Crazy Eddie stock:

| Sam M. | Number of Shares | Price/Share | Gross Proceeds |
|---|---|---|---|
| Sept., 1984(IPO) | 300,000 | $ 8.00 | $2.4 million |
| March, 1985 | 150,000 | $21.00 | $3.15 million |
| Oct., 1985 [2] | 450,000 | $12.00 | $5.4 million |
| Feb., 1986 | 60,000 | $26.00 | $1.56 million |
| March, 1986 | 200,000 | $25.22 | $5.044 million |
| July, 1987 | 150,000 | $6.12/$6.00 | $903,000 |
| TOTALS | 1.31 million | — | $18.46 million |

| Allen | Number of Shares | Price/Share | Gross Proceeds |
|---|---|---|---|
| March, 1985 | 50,000 | $21.00 | $1.05 million |
| Feb., 1986 | 20,500 | $22.00 | $451,000 |
| Dec. 22, 1986 | 100,000 | $12.00 | $1.2 million |
| Dec. 24, 1986 | 25,000 | $11.87 | $296,750 |
| Dec. 24, 1986 | 75,000 | $11.75 | $881,250 |
| TOTALS | 2.71 million | — | $3.88 million |

| Kuszer | Number of Shares | Price/Share | Gross Proceeds |
|---|---|---|---|
| March, 1985 | 50,000 | $21.00 | $1.05 million |

---

As part of a secondary public offering in March, 1985, Eddie Antar sold stock, as listed below on behalf of relief defendants Rori Antar, Sam A. Antar and Michelle Antar. This court has previously found that when he did so, Eddie Antar knew of

**2.** The October, 1985 sale was a private transaction in which Sam M. sold the 450,000 shares to Bear, Stearns & Company.

the fraudulent activities perpetrated at Crazy Eddie and, in addition, knew that the warehouse inventories had been inflated on March 3, 1985, and that the company's inflated financial results would be publicly announced in April, 1985.

| RELIEF DEFENDANT | NUMBER OF SHARES | PRICE/SHARE | GROSS PROCEEDS |
|---|---|---|---|
| Rori Antar | 25,000 | $21.00 | $525,000 |
| Sam A. Antar | 25,000 | $21.00 | $525,000 |
| Michelle Antar | 25,000 | $21.00 | $525,000 |
| TOTALS | 75,000 | $21.00 | $1.575 million |

The primary issue during the disgorgement phase of this trial was the price which Crazy Eddie stock would have sold for had there been full disclosure of the frauds, i.e. the "full disclosure price." As previously pointed out, a determination of what the price of a given stock at any given time would be is highly impractical, if not impossible. The question of how the price of a particular stock would have reacted to various items of information in the marketplace, while perhaps not purely speculative, is nonetheless fraught with imprecision. Thus, while the SEC in this case has the initial burden to establish what the price Crazy Eddie stock would have been during the relevant time period, it is not required to establish that price with precision. Rather, only a reasonable approximation will do. This court's ultimate determination of how much the defendants and relief defendants must disgorge has been informed with these caveats in mind.

The only witness to testify at the disgorgement phase of the trial was Candace L. Preston, a chartered financial analyst and the SEC's expert witness. She testified that the value of Crazy Eddie stock, assuming full disclosure, would have been $1.00 on a split-adjusted basis.[3] *Preston*

*Trial Transcript* at 50. She further testified that this figure was somewhat a conservative estimate based on her opinion that had there been full disclosure from the very beginning, i.e., prior to the initial public offering in 1984 ("IPO"), Crazy Eddie could not have effectuated the IPO.

This court finds Preston's testimony concerning the full disclosure price of Crazy Eddie common stock between September, 1984 and July, 1988 to have been credible and reasonable. As Preston pointed out in her testimony, Crazy Eddie common stock was initially sold to public investors at $8.00 per share. The IPO price was influenced in large measure by the fact that in the period between 1980 and 1984 Crazy Eddie's reported sales grew at a compound annual rate of 23.3%. Its reported income before pension contribution and income taxes ("IBPAT") grew at a compound annual rate of 47%. Accordingly, the company's IBPAT reportedly grew at twice the rate of its sales during this time period. These growth rates showed that Crazy Eddie was expanding its business (sales growth of 23.3%) and that as the company grew it was able to retain a larger percentage of sales as profits (IBPAT growth of 47%).

**3.** Preston explained the meaning of a "split adjusted" price this way:

Throughout this time period ... Crazy Eddie had two stock splits, where basically it rose to a price high enough that they actually took the same stock and gave an investor two shares. That happened twice, so in the end, even the investor ended up with four times as many shares as he had.

But at the time of the split, the price would be in half, so it would basically have been cut in a quarter, so in the beginning the eight dollar price on the split adjusted price would be divided by four, so it would be two dollars on four times as many shares.

*Preston Trial Transcript* at 54–55.

Proper disclosure of the cash skimming scheme leading up to the September, 1984 IPO, however, would have presented a vastly different picture to investors. Rather than showing a company able to capitalize on its rapid growth, the true figures would have revealed that while Crazy Eddie grew, a smaller percentage of sales was actually reaching the bottom line. If the figures are properly restated, while Crazy Eddie's net sales grew at an annual compound rate of 21.8% between 1980 and 1984, its IBPAT grew by only 14.1%.

Preston's testimony made clear that while 14.1% may have been considered a significant growth rate, it could not compare to the 47% growth rate that Crazy Eddie revealed to the investing public:

Q. And if Crazy Eddie had disclosed its actual growth rate of 14 percent, how would that affect investors' perception of the company's growth rate in the future?

A. A growth rate of 47% is phenomenal, and the ability to manage such a growth rate is important. 14 is significant-a significant growth rate, but it is no where [*sic*] near the 47 percent. And it is not-was not the kind of growth rate that one would have expected in such a hot industry as consumer electronics, and therefore, the value of the stock at its offerings would have been much, much less.

*Preston Trial Transcript* at 54. Preston opined that had the defendants' cash skimming scheme and their manipulation of Crazy Eddie's pre-IPO earnings been fully disclosed, the IPO price of the stock (as-

suming of course that there was an IPO at all) would have been no more than one-half the $8.00 per share opening price, or $4.00 per share ($1.00 per share on a split-adjusted basis).[4]

The defendants challenge Preston's opinion concerning the price of Crazy Eddie stock at the time of the IPO, contending that such an opinion is analytically flawed. They point out that Preston failed to consider Crazy Eddie's sales or earnings in the "last six months" of 1983 and 1984. They point specifically to the following testimony:

Q. In coming to an opinion as to what you considered the true value of Crazy Eddie stock to be as of the date of events in September of 1984, did you compare and contrast the sales of Crazy Eddie for the last six months of 1984 as compared with the last six months of 1983?

A. I don't believe so.

Q. You didn't?

A. No.

\*   \*   \*   \*   \*   \*

Q. And if one were to compare the sales of Crazy Eddie in the last half of 1984 and compare and contrast that with the sales of Crazy Eddie in the last half of 1983, by how much did the sales increase?

A. They increased substantially. I don't know what the percentage was.

Q. You don't know what it was, because you testified, if I heard you correctly, you never did that comparison?

---

4. Specifically, Preston testified as follows on this point:

Q. And what is your opinion as to what the stock price would have been, if Crazy Eddie disclosed its ˙actual earnings in the pre IPO period?

A. If Crazy Eddie disclosed those earnings, and the growth rate that was a third of what it was for trade, I think at the very most, if it had ever been able

to go public at all, the very most that could have been expected would be a rate of half of the IPO. If the IPO was eight dollars, then at that time half would be four dollars. When we talk about it over time, I will be talking about the split adjusted price, and that would have been a dollar compared to two dollars split adjusted offering price.

*Preston Trial Transcript* at 54.

A. I did not do that comparison.

Q. Since you didn't do that comparison-you never did a comparison between the income of Crazy Eddie for the last six months of 1984 and compare that with the income of Crazy Eddie for the last six months of 1983, did you?

A. No, I did not.

*Preston Trial Transcript* at 150–51; 154. Based on this testimony, the defendants contend that Preston failed to consider the substantial sales growth that Crazy Eddie experienced between 1983 and 1984, the year of the IPO. Accordingly, they argue, Preston's entire opinion concerning the full disclosure price of Crazy Eddie stock at the time of the IPO is unworthy of credit.

This court essentially rejects the defendants' line of argument. At the trial, and as noted by the court at that time, there was considerable confusion surrounding this testimony.

Q. Are you in the position to state whether it is not a fact that the income for Crazy Eddie for the last half of [1984] increased over the last half of [1983] . . . by a factor of 91 percent?

A. Excuse me.

Are you talking about-you are not talking about fiscal year then, are you?

Q. I didn't say fiscal year.

I asked you about this last six month, and I said ending November 30 of [1984].

Did you do that comparison?

A. No, I think if we go back, that isn't what you asked at all, sir.

\* \* \* \* \* \*

THE COURT: I think the situation is getting confused. Without being critical, may I respectfully ask counsel to propound the question again.

MR. GOLDSTEIN: I would be happy to Judge.

Q. As a matter of fact, let me give you the book, so you could read along with me.

A. I did compare November to November of the previous year. I didn't compare what I believed you were talking about, the fiscal years, but I did compare November to the previous years.

*Preston Trial Transcript* at 154–55.

It is clear from this testimony that Preston did compare the sales figures from year to year. What she did not do, however, was conduct a comparison study of the "last six months" of 1983 and 1984 for the simple reason such figures did not exist. Indeed, Crazy Eddie itself did not conduct such a comparison. As shown in the registration statement for the March, 1985 secondary public offering, the company instead broke out financial information for the six months ended November 31, 1983 and 1984.

The defendants further contend that Preston failed to consider the significant income growth experienced by the company at the time of the IPO. In the Liability Opinion, this court found that the reported net income for fiscal year 1983 was $4.6 million. The court further found that the defendants had skimmed approximately $750,000 that fiscal year. Assuming there was no fraud during this time period, Crazy Eddie's net income would have been $5.35 million ($4.6 million plus $750,000). If the $5.35 million figure is compared to the net income in 1984, which is acknowledged to be $7.95 million, then the IBPAT would have increased by 47%. Such a growth rate, the defendants contend, "would have tempered, if not eliminated entirely, any negative reaction which the investing public would have had at the time of the IPO to full disclosure." *Post Trial Brief of Defendants Sam M. Antar, Allen Antar, and Relief Defendants Rori Antar, Sam A. Antar and Michelle Antar in Regard to the Issues of Disgorgement*

*and Prejudgment Interest ("Antar Opp. Brf.")* at 18.

This court does not agree with this assessment of the limited effect full disclosure of the cash skimming would have had on the price of Crazy Eddie stock. First, while a 47% growth rate would have been impressive, this court notes that the reported growth rate was 72%, a far more impressive figure.

Secondly, however impressive a 47% growth rate from 1983 to 1984 might have been, the fact remained that there was, as a general matter, little evidence of growth between 1980 and 1983. This fact is made clear in the following table, which was incorporated into the Liability Opinion:

| Fiscal Year | Amount of Skim (Approximately) | Reported Net Income/True Net Income |
|---|---|---|
| 1980 | $3 million | $1.7 million/$4.7 million |
| 1981 | $2.5 million | $2.3 million/$4.8 million |
| 1982 | $1.5 million | $3.4 million/$4.9 million |
| 1983 | $750,000 | $4.6 million/$5.35 million |

*Antar,* 15 F.Supp.2d at 501. Thus, by reducing the skim each year, the members of the Antar family involved in this scheme created the appearance that Crazy Eddie was not only profitable, but that it also grew in profitability each year between 1980 and 1983. In reality, however, there was relatively flat growth in those years. The effect of this relatively flat growth trend was explained by this court in the Liability Opinion as follows:

> Moreover, the skimming materially altered the trend of Crazy Eddie's reported income for those four years. The income trend is especially important to investors deciding to buy or sell securities of a company, since they consider earnings in both the current year and the prior years to extrapolate what they expect the company to earn in the reasonably foreseeable future. Indeed, two analysts' reports concerning Crazy Eddie, issued in January and May, 1985, utilized the false and misleading income figures reported for 1983 to predict the company's income for 1985 and 1986. Professor Sack testified that Crazy Eddie's "trend line in the reported net income, as it was in the prospectus, would be much more attractive than the trend line would have been had the cash skimming not taken place." *Testimony of Robert J. Sack,* Vol. 9.29. The actual trend line would have shown a stable business rather than one with a growth trend. An average investor would have been less likely to invest in the company had the cash skimming been reported.

*Antar,* 15 F.Supp.2d at 509. Accordingly, it is at the very least reasonable to conclude-as Preston has implicitly done in formulating her conclusions-that a one shot 47% percent net income growth in a one year time frame would not have been sufficient to overcome relatively flat growth in the four-year period between 1980 and 1983.

And finally, this court is not convinced that a 47% growth rate between 1983 and 1984, while impressive, would have "tempered, if not eliminated entirely, any negative reaction which the investing public would have had at the time of the IPO to full disclosure." Whatever the growth rate, the fact remains that the defendants were fraudulently manipulating pre-IPO earnings through a sophisticated cash skimming scheme. Disclosure of this fact would have had a severe negative effect, to put it mildly, on the price of Crazy Eddie stock. This court agrees with the premise of Preston's opinion, that

> when a company does an IPO, [investors] make a leap of faith for the market that they are investing public money in

people whom they believe they could trust, and what is paramount to the market is the ability to trust. It is basically the foundation of all the securities laws, to make sure compliance with those help the market gain assurances of trust. The disclosure of the cash skimming would do a lot to erode that trust. *Preston Trial Transcript* at 55. Revelation of the cashing skimming scheme-the purpose of which was to manipulate the price of Crazy Eddie stock-would certainly have diminished, if not destroyed, investor trust.

The defendants also challenge Preston's testimony that $1.00 per share (split-adjusted) represented the full disclosure price throughout the pertinent time period, between 1984 (post-IPO) and 1988. Preston testified that the price of Crazy Eddie stock would have remained at approximately $1.00 for the entire period between September, 1984 and June, 1988, "because of the disclosures that would have had to have taken place at any time in that time period would have driven the price down to approximately one dollar in that time period, regardless of when it was." *Preston Trial Transcript* at 75. Preston noted that "[a]t times, those disclosures would have caused a much greater drop in value, but they would have all caused the stock to drop to approximately one dollar." *Preston Trial Transcript* at 75.

The $1.00 per share price was derived in part from the closing price of Crazy Eddie stock after full disclosure by the company's new management. In its June, 1988 Report on Form 10–K, Crazy Eddie disclosed the magnitude of the frauds perpetrated at the company, including the $65 million inventory shortfall. The company also disclosed that the government had begun an investigation into the frauds at the company and that investors could not fully rely on the prior financial statements. On the next trading day, June 2, 1988, Crazy Eddie stock closed at $1.00 per share.

Preston testified as to the significance of the June 2, 1988 closing price:

Q. And what does that one dollar closing price tell us when we try to approximate a full disclosure value of Crazy Eddie stock?

A. Tells us that is probably the maximum amount we could expect, because that dollar reflects full disclosure, but it also reflects this is a company that has had tens of millions of dollars infused into it over the course of time, so that dollar actually shows the company that has been the beneficiary of a tremendous amount of money that would not probably have been infused into the company otherwise, and without that, it would have been much lower than that.

*Preston Trial Transcript* at 76–77. The closing price of Crazy Eddie stock on June 2, 1988 is a reasonable approximation of the price of the stock throughout the relevant time period.[5] As noted previously, under the circumstances of this case, the "amount to be disgorged may be measured by the difference between the price at which the transactions were effected and the market price of the stock at a 'reasonable time after public dissemination of the inside information.'" *Chester Holdings*, 41 F.Supp.2d at 528 (quoting *MacDonald*, 699 F.2d at 54); *see also Patel*, 61 F.3d at 139–40 ("The proper measure of damages is the difference between the price paid for the shares at the time of purchase and the price of the shares shortly after the disclosure of the inside information.").

The defendants further argue that Preston failed to adequately consider various events throughout that time period which would have influenced the price of Crazy Eddie stock. The defendants' contentions will be discussed in turn.

First, the defendants point out that even after the 1987 disclosures by Messrs.

---

5. This court notes that on June 21, 1989, the date on which Crazy Eddie filed for Chapter 11 bankruptcy protection, its common stock closed at $0.25 per share.

Zinn and Palmieri of an inventory shortage of 40–45 million, Crazy Eddie's stock still traded at approximately $1.00. Accordingly, they argue, "it is difficult to comprehend how Ms. Preston could opine the stock could not have been worth more than $1.00 during a period in which there was *no* fraud or even during a period in which the frauds which were disclosed were on a far lesser scale than those later reported." *Antar Opp. Brf.* at 18 (emphasis in original).

It appears that the defendants' point here is that because Crazy Eddie stock traded at $1.00 when a substantial fraud was disclosed (the inventory shortfall in 1987), the stock traded at $1.00, that figure represents in essence a floor below which the stock price could not drop. This court finds this line of reasoning unpersuasive. First, while their reasoning suggests that the price of Crazy Eddie stock would have been greater than $1.00 at times when there was no fraud or when the frauds were on a far lesser scale, they fail to point out a particular time, between 1984 and 1988, in which no frauds were perpetrated at Crazy Eddie. As found by this court in its prior opinion, the frauds which were perpetrated at Crazy Eddie were continuous and systematic.

Secondly, the defendants' suggestion that the price of the stock would have been greater than $1.00 at times when the frauds were of a lesser scale appears to be based on certain presumptions, the validity of which are highly questionable. The first questionable presumption underlying the defendants' reasoning is that there are (or at least the investing public would make) rather clear distinctions between big and small frauds. Insofar as that principle applies to this case, this court is unable to determine how those distinctions may be properly made here. For instance, was the extensive cash skimming process more or less significant than the comparable store sales fraud perpetrated at Crazy

Eddie? Was the fraudulent inflation of inventories more or less significant than the Wren cut-off scam? Indeed, the defendants, while proposing that such distinctions can and should be made here, wholly fail to guide this court as to how those distinctions in fact may be made.

Even if we may assume that distinctions may be made among the various frauds perpetrated at Crazy Eddie, the defendants' argument appears to assume that each fraud would have had separate and incremental effects on the price of the company's stock, as it made its way down ultimately to the $1.00 share price. While this proposition may or may not be true-and the defendants have presented no evidence that Crazy Eddie stock would have followed such an incremental downward path-the law in this area does not require the SEC to be able to track the price of stock in such a precise manner. The law requires only a reasonable approximation, recognizing that it is impossible to determine how and to what extent the market will react to various events. Simply because Preston did not attempt to determine the effect that every single event had on the price of Crazy Eddie stock, even if possible, does not undermine the central points of her testimony. Any uncertainty in this regard must be resolved against the defendants.

The defendants also contend that Preston failed to consider the fact that there was a stock price rally in the consumer electronics industry beginning in early 1985 through 1986. They argue that Crazy Eddie would certainly have benefitted from this rally. At trial, Preston testified that she had prepared an average stock price index of consumer electronics retailers to compare the price of Crazy Eddie stock with those of comparable retailers. Specifically, the index included the electronics retailer stocks which had the same Standard Industrial Classification as Crazy Eddie during this time period.[6] The index

---

**6.** Preston testified that she utilized a standard methodology in constructing the index, which

showed was that while Crazy Eddie stock skyrocketed from $2 to $20 per share from 1984 to approximately October, 1986, the share price of other consumer electronics retailers rose more modestly from $1 to $1.80. *See Preston Trial Transcript* at 79–80. Thus, when the electronics rally is factored into the equation, Crazy Eddie stock would have been priced at approximately $1.80 per share during this time frame, assuming that it was perceived as an average consumer electronics business. *See Preston Trial Transcript* at 81, 83. But Preston further testified that Crazy Eddie would not have been considered average in the industry because there were no frauds being perpetrated at those companies:

> They don't have a cash skimming scheme that would have been disclosed under full disclosure. They don't have audited financials that have been pulled, because they can't get an audit. They have—they are in an entirely different position relative to whether they may in fact, have any kind of indictment coming down against them, any kind of prosecution, and there are just a myriad of reasons revolving around those, the cash skimming scheme, the same store fraud, and the inventory frauds that were not existent in these other consumer electronics retailers that would have been the far overriding consideration of Crazy Eddie stock.

*Preston Trial Transcript* at 83–84.

The defendants further argue that Preston failed to incorporate many of the favorable factors which would have increased the price of Crazy Eddie stock. Certainly, there were many favorable factors weighing in favor of the company. It had, as the defendants point out, excellent locations throughout the New York tri-state area, an extremely profitable market. It had, additionally, an aggressive and relatively successful marketing strategy, which was viewed favorably by the investing public.

Yet, these favorable characteristics could not, in the eyes of the investing public, offset the extensive and systematic frauds which were being perpetrated at Crazy Eddie. The defendants sought to manipulate the price of the company's stock to obtain huge profits from the eventual sales of their shares. It cannot be seriously argued that this would have been but one of many considerations to an investor in weighing the benefits of purchasing Crazy Eddie stock. This court will not engage in a debate over whether Crazy Eddie was truly a company with an "innovative approach to the retail market that had the potential of making it into one of the most successful discount retail businesses in the county." *Post–Trial Brief of Benjamin Kuszer and Relief Defendants on Amounts Subject to Disgorgement and Prejudgment Interest ("Kuszer Opp. Brf.")* at 11. It may certainly have been. But as innovative as it was, the core of Crazy Eddie was rotten, and the investing public, once it became aware of that fact, would not have dawdled in ridding itself of the stock. The extensive frauds would certainly have driven off the investors, and the defendants' contention that the stock retained some value despite the frauds at the company simply lacks persuasiveness.

While Crazy Eddie certainly possessed various favorable characteristics, this court cannot ignore the fact that the company also took advantage of the capital infusion experienced by the company throughout the time period based largely on fraudulent practices. The company's expansion and aggressive marketing and pricing came about, at least in some measure, by the infusion of capital through secondary stock offerings and issuance of various forms of debt securities bonds. These and

---

she described as follows:

> I use a standard methodology in constructing an index, which is first to look at the individual percentage changes of the stock that are there, average those percentage changes, and in this case start at one dollar or 100 percent and trace the average of the percentage change.

*Preston Trial Transcript* at 175.

other forms of raising capital allowed Crazy Eddie to finance its growth and daily operations. The company, however, was able to successfully raise this capital based on materially false financial reports and projections. Accordingly, while Crazy Eddie undoubtedly possessed favorable characteristics, which would have ordinarily increased the value of its stock, this court cannot ignore the fact that many of those characteristics resulted from the cumulative effect of the frauds perpetrated at the company.

In sum, this court finds that $1.00 per share is a reasonable approximation of the price at which Crazy Eddie stock would have sold assuming full disclosure. Once the SEC met its initial burden to establish a reasonable disgorgement figure, the burden shifted to the defendants to show that the calculation was not a reasonable approximation. *See Hughes Capital*, 917 F.Supp. at 1085. The defendants and relief defendants have failed to carry their burden in this regard, as they did not call any witnesses at the disgorgement phase of the trial or introduce any evidence to suggest an alternative calculation. Accordingly, this court finds that the illegal profits derived by the defendants and relief defendants are follows:

### SAM M. ANTAR

| DATE | NUMBER OF SHARES | PRICE/SHARE | AMOUNT ABOVE DISCLOSURE PRICE [7] | ILLEGAL PROFITS |
|------|------------------|-------------|-----------------------------------|-----------------|
| Sept., 1984(IPO) | 300,000 | $8.00 | $4.00 | $1.2 million |
| March, 1985 | 150,000 | $21.00 | $17.00 | $2.55 million |
| Oct., 1985 | 450,000 | $12.00 | $10.00 | $4.5 million |
| Feb., 1986 | 60,000 | $26.00 | $24.00 | $1.44 million |
| March, 1986 | 200,000 | $25.22 | $23.22 | $4.644 million |
| July 2, 1987 | 15,000 | $6.12 | $5.12 | $76,800 |
| July 6, 1987 | 10,000 | $6.12 | $5.12 | $51,200 |
| July 6, 1987 | 10,000 | $6.00 | $5.00 | $50,000 |
| July 8, 1987 | 65,000 | $6.00 | $5.00 | $325,000 |
| July 9, 1987 | 50,000 | $6.00 | $5.00 | $250,000 |
| TOTALS | 1.31 million | — | — | $15.087 million |

### ALLEN ANTAR

| DATE | NUMBER OF SHARES | PRICE/SHARE | AMOUNT ABOVE DISCLOSURE PRICE | ILLEGAL PROFITS |
|------|------------------|-------------|-------------------------------|-----------------|
| March, 1985 | 50,000 | $21.00 | $17.00 | $850,000 |
| Feb., 1986 | 20,500 | $22.00 | $20.00 | $410,000 |
| Dec. 22, 1986 | 100,000 | $12.00 | $11.00 | $1.1 million |
| Dec. 24, 1986 | 25,000 | $11.87 | $10.87 | $271,750 |
| Dec. 24, 1986 | 75,000 | $11.75 | $10.75 | $806,250 |
| TOTALS | 270,500 | — | — | $3.438 million |

7. The "Amount Above Disclosure Price" has been adjusted for stock splits as appropriate.

## BENJAMIN KUSZER

| DATE | NUMBER OF SHARES | PRICE/SHARE | AMOUNT ABOVE DISCLOSURE PRICE | ILLEGAL PROFITS |
|---|---|---|---|---|
| March, 1985 | 50,000 | $21.00 | $17.00 | $850,000 |
| TOTALS | 50,000 | — | — | $850,000 |

## RELIEF DEFENDANTS
### March, 1985

| RELIEF DEFENDANTS | NUMBER OF SHARES | PRICE/SHARE | AMOUNT ABOVE DISCLOSURE PRICE | ILLEGAL PROFITS |
|---|---|---|---|---|
| Rori Antar | 25,000 | $21.00 | $17.00 | $425,000 |
| Sam A. Antar | 25,000 | $21.00 | $17.00 | $425,000 |
| Michelle Antar | 25,000 | $21.00 | $17.00 | $425,000 |
| TOTALS | 75,000 | — | — | $1.275 million |

### B. *Prejudgment Interest*

■ The SEC also seeks prejudgment interest against each defendant and relief defendant. In his declaration filed with this court, Richard E. Simpson, Esq., the SEC's lead trial attorney in this matter, explained the methodology used for calculating interest. The total amount of prejudgment interest as to each defendant and relief defendant was calculated in the following manner:

(1) The SEC utilized an interest rate charged by the Internal Revenue Service ("IRS") for underpayment of taxes pursuant to Section 6621(a)(2) of the Internal Revenue Code. 26 U.S.C. § 6621(a)(2). The underpayment rate, specifically, is the sum of the short-term federal rate plus 3 percentage points.

(2) Interest was calculated on each sale from the first day of the calendar month following the sale.

(3) Interest was compounded at the beginning of each calendar quarter.

(4) For each sale of stock, interest was accrued until April 25, 2000.

Based on the foregoing methodology, the SEC has concluded that each of the defendants is liable for the following amounts of interest: (1) Sam M. Antar: $42,423,642; (2) Allen Antar: $8,473,045; and (3) Benjamin Kuszer: $2,456,240. Each of the relief defendants, according to the SEC's calculations, is liable for $1,228,120 in interest.

The defendants and relief defendants, for their part, do not contest the methodology used or calculations obtained by the SEC in determining prejudgment interest. Indeed, the utilization of the rates for underpayment of taxes employed by the IRS has been endorsed previously by the courts. *See, e.g., Chester Holdings,* 41 F.Supp.2d at 529; *Hughes Capital,* 917 F.Supp. at 1090; *Drexel Burnham Lambert,* 837 F.Supp. at 612 n. 8. As recognized by the Second Circuit, the IRS underpayment of taxes rate "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud." *First Jersey Sec.,* 101 F.3d at 1476.

The defendants and relief defendants focus their challenge on the appropriateness of awarding prejudgment interest on two other grounds. First, they contend that prejudgment interest should not be awarded because of the SEC's conduct in delaying the commencement of this action. And second, they argue that the amounts of interest sought are so large in comparison to the amounts of disgorgement sought, they are punitive rather than compensatory in nature. These issues will be ad-

dressed in turn after a brief discussion of the general principles applicable in determining whether an award of prejudgment interest is appropriate.

An award of prejudgment interest on the amount of disgorgement is a matter within the discretion of the court. *See Chester Holdings,* 41 F.Supp.2d at 529; *Hughes Capital,* 917 F.Supp. at 1089. " 'In exercising its discretionary powers, a court must consider both compensation and fairness.' " *Hughes Capital,* 917 F.Supp. at 1089 (quoting *SEC v. Hasho,* 784 F.Supp. 1059, 1112 (S.D.N.Y.1992)). An award of prejudgment interest, of course, is intended to compel full disgorgement of ill-gotten gains. *See Drexel Burnham Lambert,* 837 F.Supp. at 612 ("The award of prejudgment interest, like an award of disgorgement, deprives the [defendants] of their ill-gotten gains and prevents unjust enrichment."). Put another way, if defendants are not required to pay prejudgment interest on the disgorgement amount, they in effect will have gained the benefits of an "interest-free" loan throughout the relevant time period. *See SEC v. Downe,* 969 F.Supp. 149, 158 (S.D.N.Y. 1997) (awarding prejudgment interest on grounds that defendant "is not entitled to a 10–year interest free loan in the amount of his illicit profits"), *aff'd,* 151 F.3d 42 (2d Cir.1998). As recognized by the Seventh Circuit in a slightly different context,

> [m]oney today is not a full substitute for the same sum that should have been paid years ago. Prejudgment interest therefore is an ordinary part of any award under federal law.

*In re Oil Spill by the Amoco Cadiz,* 954 F.2d 1279, 1331 (7th Cir.1992).

The defendants and relief defendants first argue that the SEC improperly delayed the commencement of this action, and thus, unnecessarily increased the amount of prejudgment interest. They point out that in February, 1987, more than six years prior to the SEC's commencement of the instant action, the SEC and the United States Attorney's Office for the District of New Jersey initiated parallel investigations into activities relating to the management of Crazy Eddie and the public sale of its stock. In that same year, Sam M. Antar was named as a defendant in class action suits brought by Crazy Eddie shareholders. In addition to the ensuing grand jury investigation (which ultimately led to the indictment of Eddie Antar and Allen Antar, among others), the SEC commenced in 1989 a civil action against Eddie Antar, Sam E. Antar, and others, for disgorgement of illegal profits obtained through insider trading of Crazy Eddie stock. *See SEC v. Eddie Antar et al.,* Civil Action No. 89–3773 (D.N.J.). This suit, however, did not name Sam M. Antar, Allen Antar, Benjamin Kuszer, or the relief defendants.

The defendants and relief defendants also point out that Sam E. Antar, who became the SEC's principal source of information and was its primary witness during the liability portion of this case, was known and available to the SEC since at least 1989, when he began cooperating with government authorities in the securities fraud investigation. Thus, they argue, the SEC was fully cognizant of the claims against them as early as 1989, and its failure to bring an action before 1993 should not work to the disadvantage of the defendants or relief defendants.

Moreover, the defendants and relief defendants contend that after the instant suit was filed in September, 1993, it took more than five years for this case to reach trial. That delay resulted in some measure by the recusal proceedings of the Honorable Nicholas H. Politan, U.S.D.J., who was originally assigned judge in both the criminal and instant civil proceedings.

With respect only to defendants Sam M. Antar, Allen Antar, and Benjamin Kuszer, this court finds their contentions of undue delay on the part of the SEC to be both factually and legally infirm. No doubt, the entire litigation process stemming from the frauds perpetrated at Crazy Eddie has

taken, to be blunt, an enormous amount of time. The defendants' contention that the delay in bringing this action should be pinned on the SEC alone, however, lacks merit.

As pointed out by the SEC, the defendants themselves successfully concealed their fraudulent activities from 1984 to 1989. It was not until a July, 1989 proffer that Sam E. Antar informed the governmental officials of the cash skimming scheme, the comparable sales fraud, and the defendants' participation in those frauds. It is unreasonable to assume, however, that the SEC could and should have commenced the instant action at precisely this time. Sam E. Antar, as noted in the Liability Opinion, was an active participant in the frauds perpetrated at Crazy Eddie and was a major target of the government's investigation into activities at the company. It is simply disingenuous to contend that the SEC should have instituted an action against the defendants herein based solely on Sam E. Antar's proffer, without further investigation or corroboration.

Indeed, the SEC did not settle with Sam E. Antar in 1989 at the time of his proffer. Rather, and properly, a settlement did not come to fruition until sometime in 1991, when the information provided by Sam E. Antar began to be corroborated independently by the SEC when the Bank Leumi le-Israel, B.M., produced bank account records pertaining to Eddie Antar.[8] Those documents included records for the joint bank account controlled by Eddie and Sam M. Antar, but the latter's name had been redacted. In December, 1990, Sam M. Antar had petitioned an Israeli court to prevent the SEC from obtaining access to bank account records which would have revealed his participation in the cash skimming scheme. It was not until June, 1992 that Bank Leumi produced, within the context of a shareholder class action, deposit slips for substantial amounts of money which featured the signatures of Sam M. Antar and Benjamin Kuszer. Throughout the process of obtaining the bank's records in a piecemeal fashion, Sam M. Antar continued to obfuscate, and at times outright lie, about them and his participation in the cash skimming scheme at Crazy Eddie. *See Antar,* 15 F.Supp.2d at 487–89, 503–04.

In addition to the delays engendered by the defendants themselves, the litigation process itself took quite some time. This court notes that substantial time was expended for Sam M. Antar to conclude his deposition testimony. The completion of the Final Pretrial Order was delayed in 1996 due to Sam M. Antar's termination and substitution of counsel.

Under these circumstances, this court cannot conclude that the SEC unduly delayed in bringing or prosecuting the present action. Even if it were otherwise, a delay in obtaining a final judgment is ordinarily not a reason to deny an award of prejudgment interest. In *First Jersey Securities,* 101 F.3d at 1477, the Second Circuit plainly rejected a similar argument:

> Nor are we persuaded that it was inappropriate to order that prejudgment interest be paid for the entire period from the time of defendants' unlawful gains to the entry of judgment. Even if defendants were correct that the present litigation was protracted through some fault of the SEC, defendants plainly had the use of their unlawful profits for the entire period.... Given the remedial purpose of the statute, the goal of depriving culpable defendants of their unlawful gains, and the lack of any unfairness to defendants, we see no abuse of discretion in the court's order.

*See also Downe,* 969 F.Supp. at 158 (following *First Jersey Sec.*).

In *In re Milwaukee Cheese Wisconsin, Inc.,* 112 F.3d 845 (7th Cir.1997), defendants argued that because of the length of the litigation, interest had mounted, and

---

8. In fact, it was not until October, 1991 that Sam E. Antar fully briefed SEC attorneys on the nature and extent of the frauds at Crazy Eddie.

an award of prejudgment interest for the entire time period would therefore be punitive. The Seventh Circuit rejected this line of argument and cogently explained why delays in the litigation process, as a general matter, do not constitute grounds to deny prejudgment interest:

> [The defendants' argument] misunderstands why courts award prejudgment interest. Compensation deferred is compensation reduced by the time value of money; if the proceeds had been returned to Milwaukee Cheese's estate and distributed to the creditors, they would have been able to earn interest on it during the last decade. This is why prejudgment interest is an ingredient of full compensation. It is also why an award, no matter how large, cannot be called "punitive": defendants can invest the funds while the litigation proceeds, then use the interest they receive to satisfy the obligation.
>
> Delay is a reason to award interest, not to avoid interest; the longer the case lasts, the more of the stakes the defendant keeps even if it loses (and the less the victorious plaintiff receives) unless interest is added.... Gratuitous delay by the party seeking the award-delay that injures the other side by forcing it to act as an uncompensated trustee or investment manager-might be a reason to limit an award of interest.... But the delay here is attributable to the judicial branch, and its effect is neutral between the parties.

*Id.* at 849 (citations omitted).

This court finds that the cases relied upon by the defendants-which stand for the proposition that undue delay by a prosecuting party may justify limiting or denying prejudgment interest-are inapposite. *See, e.g., Milwaukee v. National Gypsum Co.,* 515 U.S. 189, 115 S.Ct. 2091, 132 L.Ed.2d 148 (1995); *General Motors Corp. v. Devex Corp.,* 461 U.S. 648, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983); *Koch Refining Co. v. Jennifer L. Boudreaux MV,* 85 F.3d 1178 (5th Cir.1996); *Century Wrecker*

*Corp. v. ER Buske Mfg. Co.,* 913 F.Supp. 1256 (N.D.Iowa 1996). These cases in no way undermine the proposition that prejudgment interest in federal court litigation is generally the rule and not the exception. It is only when there is clear evidence of undue delay by the prosecuting party or some other "peculiar circumstance," *Koch Refining,* 85 F.3d at 1184, should a court deny an award of prejudgment interest. As stated above, the defendants have failed to show that the SEC unduly delayed the commencement and prosecution of this action such that it is not entitled to *full* disgorgement of the defendants' ill-gotten gains.

The defendants' also contend that the extent of prejudgment interest is grossly disproportionate to the amount of disgorgement ordered by this court. I disagree. Whatever the proportion of the prejudgment interest is to the principal amount of disgorgement, the fact remains that the defendants have had the use and benefit of the ill-gotten funds from the time of their respective sales of stock. To deny the full amount of prejudgment interest would be to deny the SEC of the full value of the sums which the defendants illegally obtained. In *First Jersey Securities,* the Second Circuit affirmed district court's award of prejudgment interest in the amount of $52,689,894 on a disgorgement amount of $22,288,099. 101 F.3d at 1476. As in this case, the defendants there argued that the prejudgment interest amount was grossly disproportionate to the amount of disgorgement, and therefore, unreasonable. The court rejected such an argument, noting that the "defendants plainly had the use of their unlawful profits for the entire period...." *Id.* at 1477.

This court will therefore award prejudgment interest against the defendants in the following sums: (1) Sam M. Antar: $42,-423,642; (2) Allen Antar: $8,473,045; and (3) Benjamin Kuszer: $2,456,240.

Principles of equity have somewhat more force with respect to the relief defendants. As found by this court in the Liability Opinion, the relief defendants neither participated in nor were aware of the frauds perpetrated at Crazy Eddie. Their single connection to this case is the fact that in March, 1985, 150,000 shares of Crazy Eddie's stock was sold on their behalf at the direction of Eddie Antar, the driving force behind all of the frauds at the company. Based on these sales, each relief defendant realized a profit in the amount of $425,000 to which, as found by this court, he or she was not entitled. Because of the various machinations and peculiarities of this litigation, approximately fourteen years have lapsed since the sale of their stock was completed. To require the relief defendants to pay prejudgment interest for this entire time period-in the amount of $1,228,120 each-strikes this court as particularly inequitable. They neither substantively participated in the litigation process nor caused the delays.

This court is well aware, of course, that a finding of wrongdoing is generally not a prerequisite to an award of prejudgment interest. *See Lodges 743 and 1746, Int'l Ass'n of Machinists and Aerospace Workers v. United Aircraft Corp.,* 534 F.2d 422, 447 (2d Cir.1975) ("[A]wards of prejudgment interest are essentially compensatory . . . and wrongdoing by a defendant is not a prerequisite to an award."); *SEC v. Stephenson,* 732 F.Supp. 438, 439 n. 1 (S.D.N.Y.1990) (awarding prejudgment interest and noting that defendant's "misconduct or lack thereof is irrelevant to the issue of unjust enrichment"). And this court cannot ignore the fact that the relief defendants, no matter how innocent of the frauds perpetrated at Crazy Eddie, nevertheless had the use and benefit of monies derived from such frauds.

Accordingly, this court finds that an award of prejudgment interest from the time the complaint in this matter naming the relief defendants was filed is more appropriate. While admittedly imprecise,

calculating prejudgment interest from the filing of the complaint in some measure diminishes the prejudice to the relief defendants for conduct which they had no part in. But from that time forward, however, they became plainly aware of the possibility that the profits realized from the March, 1985 sale of stock were obtained through insider trading, and thus, subject to disgorgement. The SEC is directed to submit, within thirty (30) days of this opinion, amended calculations of the prejudgment interest with respect to each relief defendant from the time each was named as a party to this action.